ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
STEPHEN J. ODDO (174828)
soddo@robbinsarroyo.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CAROLE BUTCHER, Derivatively on Behalf of INOGEN, INC., <br><br> Plaintiff, <br><br> v. <br><br> SCOTT WILKINSON, ALISON BAUERLEIN, BYRON MYERS, BRENTON TAYLOR, HEATH LUKATCH, LOREN MCFARLAND, BENJAMIN ANDERSON-RAY, HEATHER RIDER, R. SCOTT GREER, RAYMOND HUGGENBERGER, MATTHEW SCRIBNER, and SCOTT BEARDSLEY, <br><br> Defendants, <br><br> -and- <br><br> INOGEN, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Inogen, Inc. ("Inogen" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty waste of corporate assets, unjust enrichment, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Inogen's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Inogen to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.    Inogen primarily develops, manufactures, and markets portable oxygen concentrators ("POCs"), which are medical devices used to deliver supplemental long-term oxygen therapy to patients suffering from chronic respiratory conditions.  Common chronic respiratory conditions include chronic obstructive pulmonary disease ("COPD"), chronic bronchitis, and emphysema.  In most instances, respiratory diseases like COPD develop over a lifetime and, as a result, patients tend to be elderly with access to Medicare insurance.[1]

_____

[1] Medicare is the federal health insurance program for people who are age sixty-five or older, certain younger people with disabilities, and people with permanent kidney failure. Such individuals receive government-funded health care coverage.  Long-term oxygen therapy via POCs is an approved Medicare expense.

3.      Inogen's reported revenues have grown dramatically since its initial public offering ("IPO") in 2014.  The Company's revenues increased by more than 41% from fiscal year 2014 to fiscal year 2015, by more than 27% from fiscal year 2015 to fiscal year 2016, and by more than 22% from fiscal year 2016 to fiscal year 2017.  Based on its 2016 sales, the Company claimed that it was "the leading worldwide manufacturer of [POCs]."

4.      Inogen reports its financial results in three business segments: (i) direct-to-consumer; (ii) domestic business-to-business; and (iii) international.  The Company's direct-to-consumer sales come from domestic purchases directly between Inogen and an individual patient, whereas its business-to-business sales represent domestic transactions between Inogen and home medical equipment ("HME") providers.[2]  In 2017, of the $193.9 million of revenue derived from the United States,[3] approximately 44.7% represented direct-to-consumer sales, 43% represented sales to traditional HME providers, distributors, and resellers, and 12.3% represented direct-to-consumer rentals.

5.      The Company's direct-to-consumer sales results are divided between: (i) cash sales to customers—in which the customer pays the retail price for the POC out-of-pocket; and (ii) rentals—in which the customer rents the device from Inogen, and Inogen bills Medicare or private insurance for a monthly reimbursement.  Because Medicare and HME providers seek to control costs of POC rentals, they demand lower prices from Inogen for rentals and sales.  Thus, direct-to-consumer sales at retail prices generate higher margins for Inogen.  In turn, Inogen is incentivized to focus its efforts on direct-to-consumer cash sales.

6.      Between November 8, 2017 and May 7, 2019, Inogen's officers and directors repeatedly made statements that the total addressable market ("TAM"), the Company's

---

[2] HME is a category of devices used for patients whose care is being managed from a home or other private facility managed by a nonprofessional caregiver or family member.  It is often referred to as durable medical equipment ("DME"), as it can withstand repeated use by nonprofessionals or the patient, and is appropriate for use in the home.

[3] Approximately 78% of Inogen's total revenue came from the United States in 2017.

most important and most consistently used metric, for its products was approximately three million patients and growing at a rate of 7% to 10% per year.  Because the Company represented that it barely started to scratch the market for its products, claiming only a 7% to 12% penetration, Inogen portrayed itself as a company with potential for explosive growth in the POC marketplace.  The Company has made the existence of this large and untapped market for POCs a core selling point to investors.  Similarly, due at least in part to the size of the TAM, Inogen's fiduciaries claimed that if the Company added additional sales representatives, supposedly an easy task, and increased its marketing expenditures, it would generate sales at the same rate as its previous infusions of sales and marketing investments.

7.    To grow its salesforce, in the third quarter of 2017, Inogen opened its Cleveland, Ohio facility, stating it planned to add "additional headcount of approximately 240 people over the next three years primarily in sales and customer service."  At the end of 2017, prior to the expected increase in headcount, Inogen had 381 employees in sales, marketing, clinical, and client services.  Thus, the expected increase in the additional headcount for the Cleveland facility represented a 63% growth in sales and customer service employees alone, signifying that the Company would be directing its focus almost entirely on sales efforts.

8.    Unfortunately, the Company's plan for this facility was to create a high-pressure call center designed to lead susceptible patients into paying a premium retail price out-of-pocket for its POCs, rather than rent a POC using their Medicare or private insurance benefits.  For example, according to one research firm that investigated Inogen's sales practices by interviewing the Company's sales representatives, Inogen deceitfully held itself out to customers as the only Medicare approved DME provider of oxygen therapy in certain markets.  In other instances, the Company's sales representatives told customers that Medicare did not cover POCs, and that the customers would have to purchase the POCs out-of-pocket, even though long-term oxygen therapy via POCs was an approved Medicare expense.  Along with its own abusive sales teams, the Company also partnered with

resellers who engaged in the same improper practices.  As Inogen's direct-to-consumer sales numbers grew, the Individual Defendants (as defined herein) repeatedly assured investors and analysts that Inogen's sales growth and strategy was sustainable.

9.     Contrary to the Inogen fiduciaries' improper statements, and unbeknownst to investors at the time, the defendants: (i) dramatically overstated the size of Inogen's TAM for patients on long-term oxygen therapy; (ii) misstated the basis for its calculation of the TAM; (iii) misstated the rate of growth of the TAM; (iv) misstated the POC market penetration; (v) misleadingly attributed the Company's sales growth to the sales acumen of its representatives, when, in truth, the growth was due in large part to deceptive sales tactics designed to deceive Inogen's elderly customer base; (vi) misstated the growth opportunity for Inogen's domestic business-to-business sales to HME providers; (vii) misstated that Inogen could abandon the significantly larger Medicare reimbursement rental market and continue to sustain sales growth; and (viii) failed to disclose a material risk that Inogen could lose its Medicare license due to existing fraudulent and abusive sales practices.

10.     In addition, on March 27, 2018 and March 26, 2019, certain of the Individual Defendants negligently issued materially false and misleading Proxy Statements urging stockholders to reelect certain directors.  In support of the bid to reelect certain directors, the Proxy Statements assured Inogen's stockholders the Board of Directors (the "Board") acted in accordance with the Company's Code of Ethics and Conduct and actively monitored the Company's risk exposure, including risks associated with financial controls and reporting.  In reality, the Board utterly failed in its duties by allowing the Company to engage in improper sales tactics to sell its main business product, misrepresent the Company's sales growth and market penetration, and operate with inadequate internal controls.  Given that POC sales are Inogen's core revenue generating segment—accounting for approximately 88% of the Company's revenue—the Board knew about Inogen's deceptive sales practices and improper statements about the Company's sales growth.  Armed with that knowledge, the Board allowed the misconduct to continue in order to

preserve Inogen's year-on-year revenue growth and maintain its artificially inflated stock price, exposing the Company to substantial undisclosed risks.

11.    The truth about the Inogen fiduciaries' misconduct and improper statements began to emerge on November 6, 2018, when the Company released its third quarter of 2018 financial results.  Inogen revealed that the growth in its domestic business-to-business sales to HME providers had slowed significantly from 56% in the second quarter of 2018 to 32% in the third quarter, despite the defendants' previous claims that HME providers' adoption of POCs was still in its early stages.  Furthermore, Inogen reduced its fiscal year 2018 financial guidance for adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") from a range of $65-$69 million to $60-$62 million.

12.    On this news, Inogen's stock price dropped by more than 19%, or $37.44 per share, to close at $155.86 per share on November 7, 2018, compared to the previous trading day's closing of $193.30 per share, erasing over $805 million of market capitalization.

13.    Then, on February 8, 2019, Muddy Waters Research ("Muddy Waters") published a detailed investigative report disclosing, among other things: (i) that Inogen overstated the size of its TAM; (ii) the unreliable basis for the Company's prior TAM claims; (iii) the actual growth rate of the TAM; and (iv) that Inogen overstated the penetration of POCs into the long-term oxygen therapy market.  In truth, Muddy Waters confirmed that the market for the Company's POCs was *less than half of what the Company told investors*.

14.    Just four days later, on February 12, 2019, Citron Research ("Citron") published a report revealing the deceptive and "pushy" sales practices engaged by Inogen's reseller network.  Citron also revealed that Inogen employed similar tactics designed to deceive its customer base to pay for POCs out-of-pocket instead of applying for insurance reimbursement.  Citron cited to large amounts of insider selling, shortcomings in research in development, lack of a promising pipeline, potential pricing pressures, and the fact that the Company's business is concentrated in a single product as reasons to sell the stock.

15.     On February 26, 2019, Inogen issued a press release announcing its fourth quarter and fiscal year 2018 financial results.   In the press release, the Company significantly lowered its expected growth rate of the TAM to the "low single digits" from its earlier estimate of 7% to 10%.   The press release revealed that the Company experienced slower domestic business-to-business sales activity for the quarter.   During the earnings conference call that day, Inogen's President and Chief Executive Officer ("CEO"), defendant Scott Wilkinson ("Wilkinson"), backtracked on the prior TAM estimate of 2.5 to 3 million patients.   Defendant Wilkinson blamed the Company's poor "domestic business-to-business sales" on "order activity" that "slow[ed] from one national home care provider in the fourth quarter of 2018."

16.     On this news, Inogen's stock price plummeted 24.12%, or $33.78 per share, to close at $106.28 per share on February 27, 2019, compared to the previous trading day's closing of $140.06 per share, a drop of over $736 million more in market capitalization.

17.     Finally, on May 7, 2019, the Company issued a press release announcing its first quarter of 2019 financial results.   In the press release, the Company reduced its full year 2019 total revenue guidance to a range of $405 million to $415 million, down from the prior year's range of $430 million to $440 million.   During Inogen's earnings conference call that day, defendant Wilkinson disclosed that the new sales representatives "took longer to come up the productivity curve than [Inogen's] historical target and were not at their full potential in the first quarter."   Defendant Wilkinson added that Inogen planned to "slow down the addition of new sales representatives."   In addition, the Company's executives stated that the Company expected "domestic business-to-business sales to have a slightly negative growth rate."

18.     In the wake of the May 7, 2019 disclosure, Inogen's stock plunged more than 25%, or $23.35 per share on May 8, 2019, to close at $67.79 per share compared to the previous trading day's closing of $91.14 per share, erasing over $512 million more in market capitalization.   Today, the Company's stock trades at just over $47.80 per share, an 82.6% drop from its high of $282.92 per share, a loss of nearly $5 billion.

19.     Rather than providing the market with correct information, or correcting Inogen's fiduciaries misleading statements, certain Company fiduciaries used their knowledge of material, nonpublic information to benefit themselves.  In particular, as officers and directors of Inogen, they were privy to material, nonpublic information about the Company's declining business metrics, deceptive sales practices, and financial prospects.  Altogether, the insider selling fiduciaries sold over $71 million of stock since the misleading statements began in November 2017.

20.     Further, as a direct result of this unlawful course of conduct, Inogen is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Central District of California on behalf of investors who purchased Inogen's shares (the "Securities Class Action").

21.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

22.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

23.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Inogen maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants'

primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Inogen, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

25.    Plaintiff Carol Butcher was a stockholder of Inogen at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Inogen stockholder.

**Nominal Defendant**

26.    Nominal Defendant Inogen is a Delaware corporation with principal executive offices located at 326 Bollay Drive, Goleta, California.  Inogen is a medical technology company that develops, manufactures, and markets POCs used to deliver supplemental long-term oxygen therapy to persons suffering from chronic respiratory conditions.  As of December 31, 2018, the Company had 1,099 full and part-time employees worldwide.

**Defendants**

27.    Defendant Wilkinson is Inogen's CEO and President and has been since March 2017 and a director and has been since January 2017.  Defendant Wilkinson was Inogen's President and Chief Operating Officer from January 2016 to February 2017 and Executive Vice President, Sales and Marketing from 2008 to December 2015.  Defendant Wilkinson was Inogen's Vice President, Product Management from 2006 to 2008 and Director of Product Management from 2005 to 2006.   Defendant Wilkinson is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.  Defendant Wilkinson knowingly, recklessly, or with gross negligence authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  While in possession of material, nonpublic information concerning Inogen's true

business health, defendant Wilkinson sold 57,037 shares of his stock for $8,555,054.39 in proceeds.  Inogen paid defendant Wilkinson the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2018 | $494,458 | $1,749,846 | $443,034 | $2,687,338 |
| 2017 | $402,177 | $2,099,949 | $346,240 | $2,848,366 |

28.   Defendant Alison Bauerlein ("Bauerlein") is Inogen's Chief Financial Officer and has been since January 2009, Executive Vice President, Finance and has been since March 2014 and Corporate Secretary and Corporate Treasurer and has been since 2002. Defendant Bauerlein was Inogen's Controller from March 2008 to January 2009 and 2001 to 2004 and Director of Financial Planning and Analysis from 2004 to February 2008. Defendant Bauerlein cofounded Inogen in November 2001.  Defendant Bauerlein is named as a defendant in the Securities Class Action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.   Defendant Bauerlein knowingly, recklessly, or with gross negligence authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.   While in possession of material, nonpublic information concerning Inogen's true business health, defendant Bauerlein sold 84,260 shares of her stock for $10,578,748.94 in proceeds.  Inogen paid defendant Bauerlein the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $355,212 | $699,853 | $181,868 | $5,500 | $1,242,433 |
| 2017 | $336,251 | $647,458 | $168,126 | $5,400 | $1,157,235 |

29.   Defendant Byron Myers ("Myers") is a cofounder of Inogen and has served as its Executive Vice President, Sales and Marketing since January 1, 2017.  Defendant Myers previously served as Inogen's Vice President, Marketing from 2011 to 2016.  In his current role, defendant Myers leads Inogen's Sales, Marketing, and Product Management

Operations.  Defendant Myers knowingly, recklessly, or with gross negligence authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  While in possession of material, nonpublic information concerning Inogen's true business health, defendant Myers sold 102,099 shares of his stock for $17,114,934.11 in proceeds.  Inogen paid defendant Myers the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $309,616 | $454,969 | $158,523 | $5,500 | $928,608 |
| 2017 | $245,001 | $546,878 | $122,212 | $5,400 | $919,491 |

30.   Defendant Brenton Taylor ("Taylor") is a cofounder of Inogen and serves as its Executive Vice President, Engineering.  Defendant Taylor previously served as Inogen's Director of Technology from 2003 to 2008.  Defendant Taylor is listed as an inventor on many of the Company's U.S. patents related to POC development.  Defendant Taylor knowingly, recklessly, or with gross negligence authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  While in possession of material, nonpublic information concerning Inogen's true business health, defendant Taylor sold 50,000 shares of his stock for $8,388,654.81 in proceeds.  Inogen paid defendant Taylor the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $310,423 | $454,969 | $158,937 | $5,500 | $929,829 |
| 2017 | $297,500 | $341,232 | $148,750 | $5,400 | $792,882 |

31.   Defendant Heath Lukatch ("Lukatch") is Inogen's Chairman of the Board and has been since 2008 and a director and has been since 2006.  Defendant Lukatch knowingly or recklessly authorized improper sales tactics that misled customers and made improper

statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices. Defendant Lukatch knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment. While in possession of material, nonpublic information concerning Inogen's true business health, defendant Lukatch sold 8,000 shares of his stock for $1,248,309.15 in proceeds. Inogen paid defendant Lukatch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $116,250 | $179,988 | $296,238 |
| 2017 | $75,000 | $360,618 | $435,618 |

32. Defendant Loren McFarland ("McFarland") is an Inogen director and has been since at least December 2013. Defendant McFarland is a member of the Company's Audit Committee and has been since at least March 2017. Defendant McFarland knowingly or recklessly authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices. Defendant McFarland knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment. While in possession of material, nonpublic information concerning Inogen's true business health, defendant McFarland sold 8,125 shares of his stock for $1,390,889.26 in proceeds. Inogen paid defendant McFarland the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $56,250 | $179,988 | $236,238 |
| 2017 | $60,000 | $327,850 | $387,850 |

33. Defendant Benjamin Anderson-Ray ("Anderson-Ray") is an Inogen director and has been since at least December 2013. Defendant Anderson-Ray is a member of the Company's Audit Committee and has been since at least March 2017. Defendant Anderson-Ray knowingly or recklessly authorized improper sales tactics that misled

- 11 -

customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  Defendant Anderson-Ray knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment.  While in possession of material, nonpublic information concerning Inogen's true business health, defendant Anderson-Ray sold 4,000 shares of his stock for $689,980 in proceeds.  Inogen paid defendant Anderson-Ray the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $53,250 | $179,988 | $233,238 |
| 2017 | $48,000 | $281,030 | $329,030 |

34.    Defendant Heather Rider ("Rider") is an Inogen director and has been since August 2014.  Defendant Rider knowingly or recklessly authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  Defendant Rider knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment.  While in possession of material, nonpublic information concerning Inogen's true business health, defendant Rider sold 9,722 shares of her stock for $1,696,905.79 in proceeds.  Inogen paid defendant Rider the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $46,000 | $281,030 | $327,030 |

35.    Defendant R. Scott Greer ("Greer") is an Inogen director and has been since August 2015.  Defendant Greer is the Chair of the Company's Audit Committee and has been since at least March 2018 and a member of the Committee and has been since at least March 2017.  Defendant Greer knowingly or recklessly authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  Defendant Greer knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment.  Inogen

paid defendant Greer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $60,750 | $179,988 | $240,738 |
| 2017 | $48,000 | $281,030 | $329,030 |

36.    Defendant Raymond Huggenberger ("Huggenberger") is an Inogen director and has been since January 2008.  Defendant Huggenberger was Inogen's CEO from January 2008 to March 2017 and President from January 2008 to January 2016.  Defendant Huggenberger knowingly or recklessly authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  Defendant Huggenberger knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment.   While in possession of material, nonpublic information concerning Inogen's true business health, defendant Huggenberger sold 120,106 shares of his stock for $19,763,206.02 in proceeds. Inogen paid defendant Huggenberger the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $43,750 | $179,988 | $223,738 |

37.    Defendant Scott Beardsley ("Beardsley") is an Inogen director and has been since January 2017. Defendant Beardsley knowingly or recklessly authorized improper sales tactics that misled customers and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.  Defendant Beardsley knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment.

38.    Defendant Matthew Scribner ("Scribner") served as Inogen's Executive Vice President of Operations from April 2004 to January 2019.  Defendant Scribner knowingly, recklessly, or with gross negligence authorized improper sales tactics that misled customers

and made improper statements in the Company's press releases and public filings concerning the Company's: (i) business and financial prospects; and (ii) deceptive sales practices.   Defendant Scribner knew about the improper sales tactics and improper statements because POC sales are the Company's core operating segment.   While in possession of material, nonpublic information concerning Inogen's true business health, defendant Scribner sold 17,000 shares of his stock for $2,402,111.82 in proceeds.

39.   The defendants identified in ¶¶27-30, 38 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶27, 31-37 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶32-33, 35 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶27-34, 36, 38 are referred to herein as the "Insider Selling Defendants."   Collectively, the defendants identified in ¶¶27-38 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

40.   By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Inogen and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inogen in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Inogen and not in furtherance of their personal interest or benefit.

41.   To discharge their duties, the officers and directors of Inogen were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Inogen were required to, among other things:

(a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

- 14 -

(b)     refrain from selling Inogen stock on the basis of nonpublic insider information;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls; and

(e)     remain informed as to how Inogen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

42.     Inogen holds its fiduciaries to specific corporate governance principals beyond the requirements of law.  In particular, in the Company's Corporate Governance Principles as adopted in 2013, Inogen described the duties undertaken by the Board and the active oversight role the Board played in the Company's business affairs.  The Corporate Governance Principles state that the "directors are expected to take a proactive approach to their duties and function as active monitors of corporate management. Accordingly, directors provide oversight in the formulation of the long term strategic, financial and organizational goals of the Company and of the plans designed to achieve those goals."  Furthermore, the Corporate Governance Principles provide that "[t]he Board understands that effective directors act on an informed basis after thorough inquiry and careful review, appropriate in scope to the magnitude of the matter being considered.  The directors know their position requires them to ask probing questions of management and outside advisors.  The directors also rely on the advice, reports and opinions of

management, counsel and expert advisers."

43.    The Individual Defendants, as officers and directors of Inogen, were also bound by the Company's Code of Ethics and Conduct (the "Code").  The Code sets out basic principles to guide all directors, officers, and employees of Inogen, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  With respect to the standards of conduct the Company holds its directors and employees to, the Code states:

> Inogen expects all employees and directors to act with the highest standards of honesty and ethical conduct. Inogen considers honest conduct to be conduct that is free from fraud or deception and is characterized by truthfulness. Inogen considers ethical conduct to be conduct conforming to accepted professional standards of conduct and government regulations and laws. Ethical conduct includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, as discussed below.

44.    With respect to the Company's corporate books, financial accounting, and public disclosure, the Code requires:

**FINANCIAL RECORDS AND PUBLIC DISCLOSURE**

> Every Inogen financial record – including sales records, time sheets, expense reports, books and ledgers, and other financial data and records – must be accurately and timely prepared and must be prepared in accordance with all applicable laws, principles, and standards. The integrity of the Company's financial transactions and records is critical to the operation of the Company's business and to maintaining the confidence and trust of the Company's stockholders, customers, suppliers, and employees.

> *General Principles Applicable to Employees*

> Each employee having any responsibility for, or involvement in, financial reporting or accounting must have an appropriate understanding of

relevant accounting and financial reporting principles, standards, laws, rules, and regulations as well as Inogen's financial and accounting policies, controls, and procedures.

\* \* \*

*Public Communications and Reports*

Inogen files reports and other documents with the Securities and Exchange Commission, the NASDAQ Global Market, tax authorities, and other governmental and regulatory agencies. In addition, from time to time, Inogen makes other public announcements, such as issuing press releases.

Employees involved in the preparation of these reports, documents, or announcements are expected to use all reasonable care and efforts to ensure that Inogen's disclosures are fair, complete, accurate, objective, relevant, timely and understandable. In addition, employees are expected to comply with Inogen's disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications.

\* \* \*

**DISCLOSURE**

The information in Inogen's public communications, including filings with the Securities and Exchange Commission, must be full, fair, accurate, timely, and understandable. All employees and directors are responsible for acting in furtherance of this policy. In particular, each employee and director is responsible for complying with Inogen's disclosure controls and procedures and internal controls for financial reporting. Any questions concerning Inogen's disclosure controls and procedures and internal controls for financial reporting should be directed to Inogen's Chief Financial Officer.

45.     The Code also prohibits buying and selling the Company's stock based on insider information:

**INSIDER TRADING**

The purpose of Inogen's insider trading policy is to establish guidelines to ensure that all employees and directors comply with laws prohibiting insider trading. No employee or director in possession of material, non-public information may trade Inogen's securities (or advise others to trade) from the time they obtain such information until after adequate public disclosure of the information has been made. Employees and directors who knowingly trade Inogen securities while in possession of material, non-public information or who tip information to others may be subject to appropriate disciplinary and/or enforcement action, which may include termination of employment, consistent with applicable laws. Insider trading is also a crime.

Employees and directors also may not trade in stocks of other companies about which they learn material, non-public information through the course of their employment or service with Inogen.

**Breaches of Duties**

46.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Inogen, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

47.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to the public, improper practices that wasted the Company's assets, and caused Inogen to incur substantial damage.

48.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Inogen, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result,

and in addition to the damage the Company has already incurred, Inogen has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

49.     In addition to these duties, under the Audit Committee Charter, the Audit Committee Defendants, defendants Anderson-Ray, Greer, and McFarland, owed specific duties to Inogen.  According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements.  In particular, the Audit Committee is required to:

- provide oversight of all material aspects of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

- assist the Board in monitoring (i) the integrity of the Company's financial statements, (ii) the Company's internal accounting and financial controls, (iii) the Company's compliance with legal and regulatory requirements, (iv) the organization and performance of the Company's internal audit function, and (v) the independent auditor's qualifications, independence, and performance;

- provide the Board with the results of the Audit Committee's monitoring and recommendations derived therefrom;

- provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board; and

- prepare the report that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

51. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Inogen, regarding the Individual Defendants' management of Inogen's operations and the Company's sales and marketing practices; (ii) facilitate the Insider Selling Defendant's illicit sale of over $71 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Inogen and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52. The Individual Defendants engaged in a conspiracy, common enterprise, or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

53. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

54. The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred

under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

**Overview of the Company's Products**

56.     Inogen is a medical device company that primarily develops, manufactures, and markets POCs used to deliver supplemental long-term oxygen therapy to patients suffering from chronic respiratory conditions.

57.     Traditionally, patients suffering from chronic respiratory conditions have relied on stationary oxygen concentrator systems for use in the home, and oxygen tanks or cylinders for mobile use.  The tanks and cylinders must be delivered regularly and have a finite amount of oxygen.  Additionally, patients must attach long, cumbersome tubing to their stationary concentrators to enable mobility within their homes.  POCs, on the other hand, including the Company's proprietary Inogen One® systems, pull oxygen directly from the atmosphere into a portable device weighing as little as 2.8 pounds.  This system reduces the patient's reliance on stationary concentrators and finite oxygen supply and fosters mobility.

58.     In most instances, chronic respiratory diseases develop over a lifetime and, as a result, patients tend to be elderly with access to Medicare insurance.  Medicare is the federal health insurance program for people who are age sixty-five or older, certain younger people with disabilities, and people with permanent kidney failure.  Such individuals receive government-funded health care coverage.  Long-term oxygen therapy

via POCs, like Inogen's products, is an approved Medicare expense.

59.    Inogen is an accredited Medicare DME/HME provider and is licensed to sell directly to Medicare customers in all fifty states and the District of Columbia.  As stated in Inogen's 2017 and 2018 Annual Reports, these licenses are critical to Inogen because the penalties associated with failing to comply with Medicare regulations would have a materially adverse effect on Inogen's business.  For example, if the Centers for Medicare and Medicaid Services ("CMS"), the federal agency that administers the Medicare and Medicaid programs, determine that the Company's sales practices were unlawful, the CMS could revoke the Company's Medicare accreditation.

**The Market for Inogen's Products**

60.    Inogen's reported revenues have grown dramatically since its IPO in 2014.  The Company's revenues increased by more than 41% from fiscal year 2014 to fiscal year 2015, by more than 27% from fiscal year 2015 to fiscal year 2016, and by more than 22% from fiscal year 2016 to fiscal year 2017.  Based on its 2016 sales, the Company claimed that it was "the leading worldwide manufacturer of [POCs]."

61.    Inogen's fiduciaries disclose to the public TAM as a metric to understanding the sustainability of its rapid growth.  TAM represents the number of potential customers for a given market.  In Inogen's case, TAM represents the number of people with respiratory illness that could benefit from using a POC.  To measure its TAM, defendants claimed to rely on information contained in annual Medicare data, data from the Kaiser Family Foundation for Medicare Advantage, and a report issued in 2017 by the market research firm WinterGreen Research, Inc.  Using this information, the Company claimed its TAM to be three million people on long-term oxygen therapy growing at a rate of 7% to 10% annually.  In addition, Inogen utilizes the market penetration of POCs replacing traditional oxygen therapy to inform investors of market saturation.  Lower market penetration means there is more room for sales growth.

62.    Inogen reports its financial results in three business segments: (i) direct-to-consumer; (ii) domestic business-to-business; and (iii) international.  Inogen's direct-to-

consumer sales are generally from domestic purchases directly between Inogen and an individual patient, whereas its business-to-business sales represent domestic transactions between Inogen and HME providers.  Direct-to-consumer and domestic business-to-business sales account for the majority of Inogen's revenue.  In 2017, of the $193.9 million of revenue derived from the United States, approximately 44.7% represented cash-pay sales to consumers, 43% represented sales to traditional HME providers, distributors, and resellers, and 12.3% represented direct-to-consumer rentals.

63.   According to Inogen, the "Company believes it is the only manufacturer of [POCs] that employs a direct-to-consumer strategy in the United States, meaning the Company markets its products to patients, processes their physician paperwork, provides clinical support as needed and bills Medicare or insurance on their behalf."  The Company divides its direct-to-consumer sales results between: (i) cash sales to customers—where the customer pays the retail for the POC out-of-pocket—and (ii) rentals—where the customer rents the device from Inogen and Inogen bills Medicare or private insurance for a monthly reimbursement.  Inogen sets the retail price for its POCs at approximately $2,400, or $70 per month, for a rental.  Medicare, on the other hand, sets the monthly reimbursement rate, and aggressively sets the reimbursement rates to control costs.  For example, in 2016, Medicare reimbursed the cost of a POC rental at a range of $46.69 to $49.52 a month, but dropped the rate to $36.14 to $41.91 per month in 2017.

64.   POC rentals are generally for a term of five years.  Medicare pays for thirty-six months of oxygen treatment, at which point reimbursements are "capped" and unreimbursed for the next twenty-four months of treatment.  This means that the patient pays no rental fees during this period, but the supplier retains ownership of the equipment.  Thus, providing a new device to Medicare patients to rent is not cost effective when the patient has already exhausted many of the thirty-six available monthly payments.  This effectively eliminates patients who have received a substantial number of their thirty-six months of reimbursement from the rental market for at least, if not longer, than the two capped years.

65.    The Company's domestic business-to-business segment involves sales of POCs to HME providers who then sell or rent the POCs to patients.  Business-to-business sales are divided between: (i) sales to Inogen's own private label HME; and (ii) sales to other competing HMEs.  HMEs typically buy the POCs from Inogen at negotiated rates below retail price and rent or sell the units to their customers.  Inogen's business-to-business sales compete with its direct-to-consumer sales for the same customers.

## INOGEN ENGAGES IN DECEPTIVE SALES TACTICS

66.    Due to Medicare and HME providers demanding lower prices from Inogen, direct-to-consumer sales at retail prices generate higher margins for Inogen.  These higher margins, as a result, incentivized the defendants to focus on the Company's sales and marketing efforts to push direct-to-consumer purchases.  In fact, throughout the relevant time period, the Company extended significant resources and shifted its focus to a direct-to-consumer marketing campaign.  The Company increased sales and marketing expenses by 35% from 2016 to 2017—in contrast to an increase of just 3.9% on research and development—to primarily support its direct-to-consumer strategy.  In the third quarter of 2017, the Company opened a new facility in Cleveland, Ohio, where it expected to hire approximately 240 sales representatives over the next three years.  According to the Citron report, the Company hired these sales representatives to staff a high-pressure call center at the Cleveland facility for the purpose of convincing susceptible patients to pay out-of-pocket for Inogen's POCs.

67.    The Citron report revealed that Inogen, along with its reseller distribution network, committed "elder abuse to sell [POCs] for the highest price without proper disclosure of benefits to seniors at the most vulnerable time of their life."  The report highlighted that less than 10% of Inogen's sales come from Medicare, despite the average age of the Company's customers being seventy-five and over.  According to Citron, Inogen created a toxic boiler-room sales environment, employing disreputable sales tactics to deceive its impressionable elderly customer base into buying POCs out-of-pocket, in violation of Medicare policy.  These tactics included inducing customers to purchase POCs

from Inogen at inflated prices by claiming that Medicare did not otherwise cover payment for such devices if obtained from other providers.

68.     Inogen's manipulative scheme to prey on the sick and elderly was publicly exposed online by former employees and customers.   For example, the Citron report highlighted several accounts from former employees and customers who posted online about the Company's abusive scheme.  In particular, the Citron report provided:

Citron | RESEARCH

### Inogen's Tactics Have Not Been Lost on the Employees

**indeed**

"This company is very unethical and they do everything they can to try to get over on senior citizens by harassing them to buy this portable oxygen concentrator for $3000 to $5000 and most of these people see the crooked advertisement saying the machine is covered by Medicare." – Former Employee (August 16, 2018)

"I could no longer work here because the company is severely unethical." – Former Employee (December 12, 2018)

**glassdoor**

"I would just say that it seems the company is overly obsessed with pumping up their stock price and being considered a 'hyper growth' company." – Current Employee (January 9, 2019)

"Lots of rules that don't get followed except what to say to Medicare shoppers." – Current Employee (January 2, 2019)

"They have been investigate by medicare 2 times in the last 3 years, and currently still are doing many things that violate medicare guidelines." – Current Employee (June 4, 2018)

"Medicare should take long hard look at the business practice. Advice to any patient, read the small print. The call objective is to switch from what consumer has seen in advertisement to CASH purchase" – Current Employee (October 18, 2017)

16     © Copyright 2019 | Citron Research | www.citronresearch.com | All Inquiries – info@citronresearch.com

Citron | RESEARCH

### Inogen's Scheme Can be Found in Customer Reviews

**BBB.**

"These people prey on sick and generous folks, it's inconceivable that a company in medical industry would be so unprofessional." – Customer (January 17, 2019)

"This company is suppose to cater to the elderly to me they rip off the elderly." – Customer (August 13, 2018)

"FRAUD by salesperson: Before buying a $2500 portable oxygen unit from Inogen I asked the sales rep if Medicare covered such equipment and he said no. This was blatantly deceptive. I discovered the truth when the unit I purchased from Inogen with my credit card for $2500 in December 2017 failed. My oxygen level dipped into the 70s and I am still having health issues (lethargy, fatigue, etc.) from the failure. I talked to another equipment provided who assured me that Medicare indeed covered the equipment. That company got me another unit and Medicare paid. My daughter, Valerie Mills, phoned Inogen and complained that I had been defrauded. The rep confirmed that Medicare does pay for the units but Inogen is not an authorized provider in my area. The rep deliberately withheld that information from me to make the sale." – Customer (August 7, 2018)

"I was intending to use my Medicare benefits to help with the purchase of the device… it is fairly easy to understand what's going on. It's what is referred to as the old "bait an switch"." – Customer (November 21, 2017)

17     © Copyright 2019 | Citron Research | www.citronresearch.com | All Inquiries – info@citronresearch.com

69.    In fact, defendant Wilkinson commented during an earnings conference call on April 30, 2018, about the boiler-room sales environment that Inogen created for its sales representatives.  In particular, he stated:

> So an existing rep in any given month they may work X number of leads that are already in their bucket and then Y number of new leads.  Brand new reps to come on board, it's all new leads, you have to load them up and the spend tends to be a little higher to feed them until they get the steady state.

> *        *        *

> So as we hire more reps, you've got to have more leads or else you choke the reps off and starve them.

70.    In addition to its abusive direct-to-consumer sales practices, according to Citron, Inogen and its reseller network worked together to dominate Google listings, post fake reviews about the Company online, and employ similar nefarious tactics to deceive elderly customers.  The resellers, like Inogen's in-house sales team, induced customers to purchase POCs from Inogen at inflated prices by claiming that Medicare did not otherwise cover payment for such devices if obtained from other providers.

71.    Furthermore, Citron revealed that Inogen's top reseller, 1st Class Medical, was "secretly controlled by a convicted felon who was recently released after 5 years in federal prison" after being sentenced for deceptive marketing practices.  These practices included posting fake reviews online—the same deceptive marketing practices that Citron claimed Inogen's resellers engaged in.  The Citron report went on to explain how the resellers' sales numbers had artificially increased Inogen's business-to-business sales, increases that Citron claimed were not sustainable on a long-term basis.  Based on its analysis of Inogen's financial reports and the firm's own research, Citron placed a target of just $46 per share on Inogen common stock.

**INOGEN'S FIDUCIARIES MADE IMPROPER STATEMENTS CONCERNING THE COMPANY'S TAM, MARKET PENETRATION, AND SALES GROWTH**

**Inogen Misrepresents the Size and Growth Rate of Its TAM**

72. Throughout the relevant time period, the Individual Defendants misrepresented the size of the Company's TAM by improperly overstating annual Medicare data. Inogen relied on the data's number of current oxygen therapy patients, but inaccurately assumed that each individual patient listed in the Medicare data used a separate device when, in reality, multiple patients used the same device during a given year (e.g., if a patient died, given the POC's seven-to-eight year service life, the same POC would be repurposed for another patient, which Medicare considered a second patient in its records). Thus, the Company effectively double-counted patients in instances where only one POC would be used for multiple patients during that year.

73. In addition, the Individual Defendants inaccurately claimed that the World Health Organization ("WHO") expected COPD to become the leading cause of death globally within the next fifteen years, presenting an "[a]ttractive global market opportunity" for Inogen. However, when Muddy Waters asked the WHO about the Company's claim, the WHO stated that Inogen's assertion was "most likely a mistake." Similarly, the Individual Defendants claimed that there are approximately fifteen million additional undiagnosed COPD patients—presenting a larger TAM—from the approximately fifteen million Americans currently diagnosed with COPD. The Company based this figure on an outdated 1988-1994 survey by the Centers for Disease Control and Prevention ("CDC"). As Muddy Waters explained in its report, Inogen's inference of an additional fifteen million undiagnosed COPD patients was "greatly misleading" because the CDC survey merely "concluded that approximately 50% of COPD patients were unaware they had COPD prior to diagnosis." The CDC data, as Muddy Waters stated, "does not mean that for every one diagnosed sufferer in the U.S., there is another one who has not been diagnosed."

74.     Furthermore, contrary to what the Individual Defendants represented, not all patients on long-term oxygen therapy are potential customers because POCs are inappropriate devices for nonambulatory patients,[4] or for those patients who require the continuous flow of oxygen rather than the pulse flow provided by a POC.

75.     With respect to the growth rate of the TAM, the Individual Defendants made improper statements by claiming the data indicated positive annual growth rates.  In truth, the Medicare data and the Kaiser Family Foundation data for Medicare Advantage relied upon by the Individual Defendants reported negative annual growth rates.

**Inogen Misrepresents the Market Penetration of Its POCs**

76.     Throughout the relevant time period, the Individual Defendants also made improper statements concerning the low market penetration of POCs and the Company's ability to become the leading POC manufacturer responsible for achieving 90% penetration of POCs for ambulatory patients.  The industry consensus is that POCs are inappropriate for up to 50% of ambulatory patients, such as those who only need oxygen therapy for sleep.  Such ambulatory patients are thus highly unlikely to obtain a POC, cutting Inogen's estimated market penetration by up to half.  Furthermore, some patients with more advanced respiratory diseases require a stronger continuous oxygen stream than Inogen's pulse stream POCs can provide.

77.     In addition, the defendants' conscious decision to abandon the rental market and shift to direct-to-consumer sales would leave Inogen unable to service the larger and more stable Medicare and insurance rental reimbursement market.  Even considering the more stable rental market, however, POC rentals became heavily constrained by low Medicare reimbursement schedules, which had dropped from a range of $46.69 to $49.52 per month in 2016, down to $36.14 to $41.91 per month in 2017, rendering Inogen's POC

---

[4] Ambulatory patients are patients that are unable to walk unassisted after surgery or medical treatment.  Ambulatory care, or outpatient care, is medical care provided on an outpatient basis, including diagnosis, observation, consultation, treatment, intervention, and rehabilitation services.  This care can include advanced medical technology and procedures even when provided outside of hospitals.

rentals increasingly less profitable, or, in the alternative, less desirable for patients to rent on a partial cost reimbursement basis. Because Medicare capped reimbursement after three years into the five-year rental term, Inogen could only profitably rent to patients early into the reimbursement period, effectively eliminating as potential customers far more than just the 18% of patients in years four and five of their rentals.

**Inogen Misrepresents Its Ability to Sustain the Growth of Its POC Cash Sales**

78. Throughout the relevant time period, the Individual Defendants made improper statements concerning the Company's ability to achieve easy and sustainable growth of POC cash sales. In truth, Inogen faced several problems that would limit its purported sustainable growth. First, the POC cash sales market was limited to patients who had thousands of dollars on hand to purchase the POCs, and could not wait for Medicare or private insurance to process their claim. Even with this limited market, the Company's out-of-pocket cash sales growth was skewed by the toxic boiler-room sales environment employed by Inogen to deceive its elderly customer base, as described herein. Further, these deceptive sales practices presented a material risk that Inogen's ability to continue to entice POC patients to pay out-of-pocket would be substantially constrained by CMS revoking Inogen's Medicare accreditation for deceiving patients. Finally, as the Individual Defendants later revealed, Inogen's newly-hired sales representatives in 2018 were not of the same quality as the earlier hires because the Company had virtually exhausted the applicant pool. Based on the foregoing, Inogen's purported growth in POC cash sales was unsustainable.

**Inogen Misrepresents Its Ability to Grow Its Business-To-Business Sales of POCs to HMEs**

79. Throughout the relevant time period, the Individual Defendants made improper statements concerning the Company's ability to grow its business-to-business sales of POCs to HMEs. Contrary to their claims, and as described herein, Inogen's HME partners employed the same deceptive sales tactics as the Company's in-house sales team, severely limiting future sales growth. HMEs also were facing a number of issues

concerning the pricing of POCs and limited sales potential of POCs.  These included price constraints from their customers and insurance reimbursement schedules, multiple would-be direct-to-consumer customers over the lifespan of a single POC, and more POC purchases than they could reasonably deploy.  In addition, Inogen's business-to-business sales competed with its direct-to-consumer sales for the same customers, indicating unsustainable growth for the Company given that its sales divisions were cannibalizing business from each other.

## THE IMPROPER STATEMENTS

80.    Beginning in November 2017, the Individual Defendants breached their fiduciary duties by repeatedly making improper statements in the Company's SEC filings, press releases, and public communications concerning Inogen's business, financial prospects, and financial condition.  Specifically, the Individual Defendants repeatedly made improper statements and failed to disclose to Inogen's investors and the broader market that: (i) Inogen overstated the true size of the TAM for POCs; (ii) Inogen misrepresented the basis for its calculation of the TAM; (iii) Inogen misrepresented the market penetration for POCs; (iv) Inogen falsely attributed its sales growth to the strong sales acumen of its salesforce, when in reality its growth was due in large part to deceptive sales tactics designed to deceive its elderly customer base; (v) as such, Inogen's projected growth in its domestic business-to-business sales to HME providers was inflated and unsustainable; (vi) only a small fraction of Inogen's business came from the more stable Medicare market; and (vii) as a result, Inogen's public statements were materially false and misleading at all relevant times.

**The Improper Statements in the November 7, 2017 Press Release**

81.    On November 7, 2017, Inogen issued a press release announcing its third quarter of 2017 financial results for the period ended September 30, 2017, and provided financial guidance for the remainder of fiscal year 2017 and fiscal year 2018.  In the press release, the Company announced "[r]ecord" third quarter of 2017 financial results, with total revenue of $69 million, up 26.8% over the same period in 2016, net income of $7.3

million, up 39.9% over the same period in 2016.  In particular, the press release stated:

**Third Quarter 2017 Highlights**

- Record total revenue of $69.0 million, up 26.8% over the same period in 2016

  - Sales revenue of $63.1 million, up 33.8% over the same period in 2016

  - Rental revenue of $5.9 million, down 18.7% from the same period in 2016

- Net income of $7.3 million, reflecting a 39.9% increase over the same period in 2016 and a 10.6% return on revenue

- Adjusted EBITDA of $14.1 million, representing 30.6% growth over the same period in 2016 and a 20.4% return on revenue (see accompanying table for reconciliation of GAAP and non-GAAP measures)

- Total units sold were 36,000, an increase of 9,400, or 35.3%, over the same period in 2016, reflecting the strong consumer demand for the Company's products across all sales channels

\*   \*   \*

**Third Quarter 2017 Financial Results**

Total revenue for the three months ended September 30, 2017 rose 26.8% to $69.0 million from $54.4 million in the same period in 2016. Direct-to-consumer sales rose 43.5% over the same period in 2016, ahead of our expectations primarily due to an increased number of sales representatives and increased productivity. Domestic business-to-business sales exceeded our expectations and grew 41.7% over the same period in 2016, primarily driven by continued strong demand from traditional home medical equipment providers and our private label partner. International business-to-business sales in the third quarter of 2017 grew 14.9% over the comparative period in

2016, primarily due to demand from our partners in Europe. Rental revenue decreased 18.7% from the same period in 2016, primarily due to the declines in rental reimbursement rates and our strategic focus on sales versus rentals. Rental revenue declined to 8.5% of total revenue in the third quarter of 2017 from 13.3% of total revenue in the third quarter of 2016.

Total gross margin was 48.1% in the third quarter of 2017 versus 46.2% in the comparative period in 2016. Sales gross margin was 50.3% in the third quarter of 2017 versus 48.6% in the third quarter of 2016. The sales gross margin percentage improvement was primarily attributable to an increased sales mix towards direct-to-consumer sales and lower cost of goods sold per unit, mostly due to lower materials costs, partially offset by declining business-to-business average selling prices. Rental gross margin was 24.3% in the third quarter of 2017 versus 30.7% in the third quarter of 2016. The decrease in rental gross margin was primarily driven by reimbursement rate reductions and partially offset by lower cost of rental revenue primarily associated with lower depreciation.

82.    Inogen also raised its guidance range for fiscal year 2017 and provided guidance for the full year of 2018.  In particular, the press release stated:

**Financial Outlook for 2017 and 2018**

Inogen is increasing its guidance range for full year 2017 revenue to $244 to $248 million, which represents year-over-year growth of 20.3% to 22.3%, and compares to previous guidance of $239 to $243 million. The Company expects direct-to-consumer sales and domestic business-to-business sales to be our strongest growing channels and to have similar growth rates, and international business-to-business sales to have a more modest growth rate where the market penetration strategy is expected to be primarily focused on the European markets. Inogen expects rental revenue to decline in 2017 compared to 2016 by approximately 32% based on lower average rental

revenue per patient and a focus on sales versus rentals.

Inogen is maintaining its guidance range for full year 2017 net income of $25 to $27 million, which represents 21.8% to 31.6% year-over-year growth. Inogen continues to estimate that the effect of ASU No. 2016-09 will lead to a decrease in provision for income taxes of approximately $8.0 million in 2017 based on forecasted stock activity. However, this estimated decrease, which will continue to lower its effective tax rate, can vary depending on fluctuations due to timing, stock price changes and size of stock option exercises and stock transactions. Excluding the estimated $8.0 million decrease in provision for income taxes associated with ASU No. 2016-09 expected in 2017, the Company expects an effective tax rate of approximately 36% to 37%.

\*       \*       \*

Inogen is also providing a guidance range for full year 2018 total revenue of $295 to $305 million, representing 19.9% to 24.0% growth over the 2017 guidance mid-point of $246 million. The Company expects direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate, and international business-to-business sales to have a modest growth rate, where the strategy will continue to be heavily focused on the European markets. Inogen expects rental revenue to be relatively flat in 2018 compared to 2017 with reimbursement rates stable and a continued focus on sales versus rentals.

83.     Defendant Wilkinson commented in the press release, crediting the "record revenue quarter" to the growing market for POCs and Inogen's salesforce. In particular, defendant Wilkinson stated:

The third quarter of 2017 was a record revenue quarter for us, driven by increased sales in our domestic business-to-business and direct-to-consumer channels. … We are executing on our strategic initiatives and

1  remain focused on increasing adoption of our best-in-class oxygen product
2  offerings across all of our channels. We believe we should see strong results
3  in 2018 as portable oxygen concentrators continue to be adopted worldwide.

**The Improper Statements in the November 7, 2017 Earnings Conference Call**

5  84.    Also on November 7, 2017, Inogen hosted an earnings conference call with
6  investors and analysts to discuss the Company's third quarter of 2017 financial results.  In
7  his prepared remarks, defendant Wilkinson attributed the Company's ongoing sales growth
8  to the sales acumen of its salesforce.  In particular, he stated:

9  We continued to steadily invest in direct-to-consumer sales force
10  additions in the United States. We also worked to optimize our new customer
11  relationship management, or CRM system, and I'm pleased that we have
12  delivered such strong sales and solid bottom line results during the third
13  quarter while we were still investing in training and productivity
14  improvements in the system.

15  85.    Defendant Wilkinson also stated that Inogen's "strategy is to hire additional
16  sales employees in the fourth quarter of 2017 and throughout 2018 and invest in marketing
17  activities to increase consumer awareness as we believe this is still our most effective
18  means to drive growth of direct-to-consumer sales."

19  86.    During her prepared remarks, defendant Bauerlein emphasized the Company's
20  expected revenue growth in 2018.  She stated that Inogen was "continuing to invest in our
21  new Cleveland area facility, European facility and our CRM system while also continuing
22  to ramp our direct-to-consumer sales reps and the related media investments, which we
23  expect will contribute to 2018 revenue growth."  Defendant Bauerlein also highlighted the
24  Company's focus on sales rather than rentals.  In particular, she stated:

25  We expect direct-to-consumer sales to be our fastest-growing channel,
26  domestic business-to-business sales to have a significant growth rate and
27  international business-to-business sales to have a modest growth rate where
28  the strategy will still be focused on the European market. We expect rental

revenue to be relatively flat, meaning plus or minus 5%, in 2018 compared to 2017 due to our continued focus on sales versus rental.

87.     Defendant Bauerlein continued to highlight Inogen's strengths in the direct-to-consumer segment, boasting that "our reps have become more productive, and that's in spite of the headwinds that we saw on the CRM implementation."  She further explained:

> We've been able to continue to add to our Cleveland site as well.  And while you know that those sales reps take 4 to 6 months to come up to productivity, we are starting to see the contributions from the people we have hired in the first half of the year, and we expect the people that we hired in the second half of the year to really contribute more materially going into 2018.  And that's really why we still expect in 2018 direct-to-consumer sales to be the fastest-growing channel in our business because we are continuing to invest there.  And that's why we really expect that to continue to be the key driver to our sales growth.

88.     During the question and answer section, one analyst inquired about the productivity of the Company's sales representatives, the number of sales force hires, and their contribution to "the top line."  Defendant Bauerlein confirmed that Inogen would ramp up its new sales hires quickly and that the new representatives would quickly contribute. In particular, she stated:

> Now on the rep side, they still take about 4 to 6 months to come up to productivity, but they start contributing in the first couple of months. So they certainly start making some sales and then ramp to that full productivity in months 4 through 6. So it's a relatively quick turn from when a rep is hired to when they start producing.

89.     During the conference call, the defendants also expressed confidence that Inogen's business-to-business sales would experience rapid growth, driven by purchases from traditional HME providers and private label demand.  In particular, defendant Wilkinson stated:

We are very pleased with our domestic business-to-business sales in the third quarter of 2017, which increased 41.7% over the third quarter of 2016, exceeding our expectations.

Growth in this channel was primarily driven by purchases from traditional home medical equipment providers and strong private label demand.  Revenue from our private label partner and traditional HME providers combined represented more than half of the domestic business-to-business channel's total sales revenue in the third quarter of 2017.

90.     Defendant Wilkinson also highlighted the market opportunity for sales of Inogen's POCs, stating:

[W]e estimate that the share of portable oxygen concentrators in Medicare oxygen therapy grew from 8.0% in 2015 to 9.1% in 2016.

However, this estimate does not include patient cash sales or private insurance transactions.  Our direct-to-consumer cash sales in 2016 grew significantly faster than rentals.  So we believe that this data from CMS may represent a conservative estimate of actual portable oxygen concentrator market penetration.

That said, POCs were still the fastest-growing modality in oxygen therapy based on the CMS data and still have a significant growth opportunity before reaching full market saturation.

91.     The slides Inogen published in connection with its third quarter of 2017 financial results contained the Company's improper TAM and TAM growth figures.  One slide represented that the U.S. Market for POCs experienced "7-10% growth per year" and would grow from three million patients in 2015, to four million patients in 2019.  On the same slide, the defendants also stated the market was actually much larger than these estimates, providing that "an estimated 50% of COPD patients are currently undiagnosed."

**The Improper Statements in the November 7, 2017 Form 10-Q**

92.     Also on November 7, 2017, Inogen filed its Quarterly Report on Form 10-Q for the period ended September 30, 2017 (the "Q3 2017 Form 10-Q") with the SEC. Defendants Wilkinson and Bauerlein signed the Q3 2017 Form 10-Q.  In the Q3 2017 Form 10-Q, Inogen touted the strength of its sales growth and the size of its TAM.  In particular, Inogen stated:

> The Company estimates based on 2016 Medicare data that patients using portable oxygen concentrators represent approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay sales into the market.
>
> *    *    *
>
> Since adopting the Company's direct-to-consumer strategy in 2009 following its acquisition of Comfort Life Medical Supply, LLC, which had an active Medicare billing number but few other assets and limited business activities, the Company has directly sold or rented more than 327,000 of its Inogen oxygen concentrators as of September 30, 2017.

**The Improper Statements During the January 9, 2018 JPMorgan Healthcare Conference**

93.     On January 9, 2018, the defendants presented on behalf of Inogen at the JPMorgan Healthcare Conference.  During the conference, defendant Bauerlein touted Inogen's success in selling POCs directly to patients who paid cash out-of-pocket, and exaggerated the size and nature of the market for these sales despite the existence of the Medicare reimbursement.  In particular, she stated:

> Sales have been growing very nicely on the direct-to-consumer side, over 40% in the third quarter.  And now, this is really people who are buying retail out-of-pocket, showing the true demand for POCs, in the fact that patients really have an interest in getting a POC instead of the tank-based systems that they already have.

94.     Defendant Bauerlein asserted that, by Inogen's hiring of talented sales representatives, Inogen would ensure that it could continue its extraordinary direct-to-consumer growth.  In particular, she stated:

> [W]e really did want to invest in the sales team because that's our #1 limiter to growth and we were able to execute that.  Majority of those sales rep additions were in the Cleveland facility, so that started in September and through the end of the year.  So these people are still in the very early stages of coming up the curve of productivity.  They take about 4 to 6 months to come up to productivity.  And this is the main driver of why we expect, in 2018, to have $300 million in sales at the midpoint of guidance.  Because we expect direct-to-consumer sales to be the fastest-growing segment because of the investments that we've made in the inside sales team in 2017.  And we expect to continue to expand that team going into 2018.  And that Cleveland area facility, over the next 3 years, we expect to add 240 employees, a mix of sales and service employees.

95.     During the conference, the defendants also conveyed a heightened optimism in the business-to-business segment due to the spillover effects from their direct-to-consumer sales and marketing teams.  Defendant Wilkinson stated:

> As I noted, while our primary go-to-market strategy is to focus on patients, the Medicare competitive bidding cuts have put pressure on the providers, such that delivering tanks is simply unsustainable.  They've looked at Inogen as the leader in the space to help them transition their model from a delivery model to a nondelivery one.  We're the company that has 10 years' experience employing a nondelivery model ourselves.  So we've proven that the model works, we've proven it with our products.  So our value to that provider channel is not only in the best product on the market, with a strong reliability but also in our know-how and how to administer the nondelivery model.  You see there we've had great growth results through our direct-to-

consumer strategy, but we've also had incredible growth through the business-to-business channel in the United States.  So we've reaped the benefits on both side through our direct-to-consumer approach.

**The Improper Statements in the February 27, 2018 Press Release**

96.    On February 27, 2018, Inogen issued a press release announcing its fourth quarter and fiscal year 2017 financial results for the period ended December 31, 2017.  In the press release, the Company announced revenue growth in the quarter, strong demand, and sales growth.  In particular, the press release stated:

**Fourth Quarter 2017 Financial Results**

Total revenue for the three months ended December 31, 2017 rose 25.4% to $63.8 million from $50.9 million in the same period in 2016. Direct-to-consumer sales rose 57.5% over the same period in 2016, ahead of our expectations and primarily due to an increase in the number of sales representatives, marketing expenditures, and sales representative productivity. Domestic business-to-business sales also exceeded our expectations and grew 46.1% over the same period in 2016, primarily driven by continued strong demand from our private label partner and traditional home medical equipment providers. International business-to-business sales in the fourth quarter of 2017 declined 0.8% from the comparative period in 2016, primarily due to no major European tenders being awarded to our provider partners in the fourth quarter of 2017. Additionally, the fourth quarter of 2016 included sizeable unit orders from South Korea that did not repeat in the fourth quarter of 2017, creating a difficult comparable. Sales in Europe represented 84.3% of international sales in the fourth quarter of 2017, up from 83.3% in the fourth quarter of 2016. Rental revenue in the fourth quarter of 2017 was $5.4 million compared to $8.2 million in the fourth quarter of 2016, representing a decline of 34.1% from the same period in the prior year, primarily due to the $2.0 million rental benefit recorded in the fourth quarter

of 2016 associated with the 21st Century Cures Act (Cures Act), which increased reimbursement rates retrospectively for some Medicare beneficiaries, and our continued focus on direct-to-consumer sales versus rentals.  Rental revenue declined to 8.5% of total revenue in the fourth quarter of 2017 from 16.2% of total revenue in the fourth quarter of 2016.

97.     The Company also increased its financial guidance for fiscal year 2018.  In particular, the press release stated:

**Financial Outlook for 2018**

Inogen is increasing its full year 2018 total revenue guidance range to $298 to $308 million, up from $295 to $305 million, representing growth of 19.5% to 23.5% versus 2017 full year results. The Company expects direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate, and international business-to-business sales to have a modest growth rate, where the strategy will continue to be heavily focused on the European markets. Inogen expects rental revenue to be relatively flat in 2018 compared to 2017 as the Company continues to focus on sales versus rentals.

Further, the Company is also increasing its full year 2018 GAAP net income and non-GAAP net income guidance range to $36 to $39 million, up from $31 to $35 million, representing growth of 71.4% to 85.7% compared to 2017 GAAP net income of $21.0 million and growth of 26.0% to 36.5% compared to 2017 non-GAAP net income of $28.6 million. The Company estimates that the decrease in provision for income taxes related to excess tax benefits recognized from stock-based compensation will lead to a decrease in provision for income taxes of approximately $8.0 million in 2018 based on forecasted stock activity, which would lower its effective tax rate as compared to the U.S. statutory rate. Excluding the $8.0 million decrease in provision for income taxes expected in 2018, the Company expects an effective tax rate

of approximately 25%, down from its previous estimate of 37% due to the TCJA. The Company expects its effective tax rate including stock compensation deductions to vary quarter-to-quarter depending on the amount of pre-tax net income and on the timing and size of stock option exercises.

98.   Defendant Wilkinson also commented in the press release, touting the Company's "successful [fourth] quarter" as being "driven by record sales in our domestic direct-to-consumer channel and strong sales in our domestic business-to-business channel."   As a further signal of the supposed strength of Inogen's sales and marketing strategy, defendant Wilkinson told investors that in the fourth quarter of 2017, "we continued hiring in our Cleveland facility primarily to expand our direct-to-consumer sales team."

**The Improper Statements in the February 27, 2018 Earnings Conference Call**

99.   On February 27, 2018, the Company hosted an earnings conference call with investors and analysts to discuss its fourth quarter and fiscal year 2017 financial results. During the conference call, defendant Wilkinson again emphasized that Inogen's record sales growth would continue simply by increasing the number of sales representatives hired in the new Cleveland facility and increasing "consumer awareness."   In particular, he stated:

> Our record direct-to-consumer sales of $24.5 million in the fourth quarter of 2017 exceeded our expectations, as we steadily added new inside sales representatives, with most located in our new Cleveland facility. Our direct-to-consumer sales team consisted of 263 inside sales reps as of December 31, 2017, which represented an increase of 86 reps over our 2016 year-end total of 177.

> Our strategy is to steadily hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as we believe this is still our most effective means to drive growth of direct-to-consumer sales.

100.   Defendant Bauerlein also attributed the sales growth to additional sales representatives and their sales acumen, stating that "[d]irect-to-consumer sales for the fourth quarter of 2017 were a record $24.5 million, representing 57.5% growth over the fourth quarter of 2016, primarily due to increased sales representative headcount, increased marketing expenditures and increased productivity."

101.   During the question and answer session of the conference call, one JPMorgan Chase & Co. analyst asked "about what the historical correlation has been from adding new sales reps and how that translates into sales growth going forward and what that might mean in terms of growth rates in '18 in the [direct-to-consumer] channel."  In response, defendant Bauerlein confirmed the correlation with the additional sales representatives and an increase in sales.  In particular, she stated:

> So it has closely correlated with, over time, the sales growth in that direct-to-consumer sales channel.  So we would expect that as we've added this additional sales capacity outside of that first 4- to 6- month investment that you have for new hires, that you will see that growth on the direct-to-consumer side associated with us increasing that sales capacity.  Because as you know, our limit to growth in creating additional consumer awareness is really tied to how much sales capacity we have.  So as we add that additional sales capacity, we spend more in marketing to drive more leads to fill that sales capacity.  And that's our plan going forward as well.  And we do plan to continue to add reps going into 2018 as well as we still think we're a long way from full saturation on the direct-to-consumer sales side of the business.

102.   When asked about his 10% to 12% market penetration figures, defendant Wilkinson expressed his confidence that the process of adding sales representatives and marketing spend would be effective in increasing Inogen's direct-to-consumer sales, given that it is "relatively easy to sell somebody a unit if they have the money, because it's hard to put a price on freedom."  He also stated that the "opportunity today is still using our sales team to convert oxygen patients, so that's what we're focused on."

103.   Defendant Wilkinson also highlighted the simplicity of the Company's sales strategy, stating:

> [W]e don't assign territories to the inside reps.  We've got leads coming in every day from all over the USA, and they are distributed more or less evenly across the sales force.  So the way we manage the sales team is every rep is going to get x number of new leads every month.  By not assigning territories, it's made it really easy for us to scale, because if you think about it, if we did have more territories, then you've got to rebalance and recut your sales territories really almost every month the way we've scaled the sales team.

**The Improper Statements in the 2017 Form 10-K**

104.   On February 27, 2018, Inogen filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  The 2017 Form 10-K was signed by defendants Wilkinson, Bauerlein, Lukatch, Anderson-Ray, Rider, McFarland, Greer, Beardsley, and Huggenberger.  In its 2017 Form 10-K, Inogen touted the TAM for its POCs, which the Company essentially claimed lacked any threat of market competition.  In particular, the 2017 Form 10-K stated:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. We estimate based on 2016 Medicare data that the total number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

*   *   *

> **Our market**
>
> We believe the current total addressable oxygen therapy market in the United States is approximately $3 billion to $4 billion, based on 2016 Medicare data and our estimate of the ratio of the Medicare market to the total market. As of 2016, we estimate that there are 4.5 million patients worldwide

who use oxygen therapy, including 2.5 to 3 million patients in the United States, and more than 60% of oxygen therapy patients in the United States are covered by Medicare. The number of oxygen therapy patients in the United States is projected to grow by approximately 7% to 10% per year between 2017 and 2021, which we believe is the result of earlier diagnosis of chronic respiratory conditions, demographic trends and longer durations of long-term oxygen therapy.

\*   \*   \*

Despite the ability of portable oxygen concentrators to address many of the shortcomings of traditional oxygen therapy, we estimate based on 2016 Medicare data that the total number of patients on portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

**The Improper Statements in the April 30, 2018 Press Release**

105.   On April 30, 2018, Inogen issued a press release announcing its first quarter of 2018 financial results for the period ended March 31, 2018, in which the Company reported "[r]ecord total revenue of $79.1 million, up 50.6% over the same period in 2017." In particular, the press release stated:

**First Quarter 2018 Highlights**

- Record total revenue of $79.1 million, up 50.6% over the same period in 2017
  - Record sales revenue of $73.6 million, up 60.1% over the same period in 2017
  - Rental revenue of $5.5 million, down 16.3% from the same period in 2017
- GAAP net income of $10.8 million, reflecting an 81.4% increase over the same period in 2017 and a 13.6% return on revenue

- 44 -

- Adjusted EBITDA of $15.5 million, representing 42.7% growth over the same period in 2017 and a 19.6% return on revenue (see accompanying table for reconciliation of GAAP and non-GAAP measures)
- Total units sold were 45,400, an increase of 19,800, or 77.3%, over the same period in 2017

106.   In addition, the Company once again increased its fiscal year 2018 financial guidance based on its expectation of an increase in the sales growth rate.  In particular, the press release stated:

**Financial Outlook for 2018**

Inogen is increasing its full year 2018 total revenue guidance range to $310 to $320 million, up from $298 to $308 million, representing growth of 24.3% to 28.3% versus 2017 full year results. The Company continues to expect direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate, and international business-to-business sales to have a modest growth rate, where the 2018 strategy will continue to be heavily focused on the European markets. Inogen now expects rental revenue to be down approximately 10% in 2018 compared to 2017 as the Company continues to focus on sales versus rentals.

Further, the Company is also increasing its full year 2018 GAAP net income and non-GAAP net income guidance range to $38 to $41 million, up from $36 to $39 million, representing growth of 80.9% to 95.2% compared to 2017 GAAP net income of $21.0 million and growth of 33.0% to 43.5% compared to 2017 non-GAAP net income of $28.6 million. The Company still estimates that the decrease in provision for income taxes related to excess tax benefits recognized from stock-based compensation will lead to a decrease in provision for income taxes of approximately $8.0 million in 2018 based on forecasted stock activity, which would lower its effective tax rate as compared to the U.S. statutory rate. Excluding the estimated $8.0 million decrease in

provision for income taxes expected in 2018, the Company expects a non-GAAP effective tax rate of approximately 25%. The Company expects its effective tax rate including stock-based compensation deductions to vary quarter-to-quarter depending on the amount of pre-tax net income and on the timing and size of stock option exercises.

Inogen is also increasing its guidance range for full year 2018 Adjusted EBITDA to $62 to $67 million, up from $60 to $64 million, representing 22.0% to 31.8% growth compared to 2017 results.

Inogen also expects net positive cash flow for 2018 with no additional equity capital required to meet its current operating plan.

107. The press release further touted the Company's strong sales results and outlook, stating:

The Company continues to expect direct-to-consumer sales to be its fastest growing channel, [and] domestic business-to-business sales to have a solid growth rate.

108. Defendant Wilkinson also commented in the press release, crediting the increase in Inogen's fiscal year 2018 guidance to the "strong" and "growing" market for POCs and the sales acumen of its direct-to-consumer and domestic business-to-business salesforce. In particular, defendant Wilkinson stated:

In what is historically a seasonally slower quarter, we were able to generate record revenues driven by strong sales in both our domestic direct-to-consumer and domestic business-to-business channels. … We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our sales channels. We are currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020. We believe we should see strong sales growth in 2018 as portable oxygen concentrator penetration increases worldwide.

**The Improper Statements in the April 30, 2018 Earnings Conference Call**

109.   Also on April 30, 2018, the Company held an earnings conference call with analysts and investors to discuss its first quarter of 2018 results.  During the call, defendant Wilkinson again emphasized Inogen's purportedly strong direct-to-consumer and business-to-business sales growth.  In particular, he stated:

> Our record direct-to-consumer sales of $28.7 million in the first quarter of 2018 exceeded our expectations, primarily due to increased sales representative headcount and associated consumer spending. We're currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020, with the majority of those being sales reps. Given our recent success, our strategy is to steadily hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as we believe that it's still our most effective means to drive growth of the direct-to-consumer sales.

> In fact, we expect to release a new TV commercial to showcase the benefits of our portable oxygen concentrators in the second quarter. Further, we initiated a direct-to-consumer pricing trial in the second quarter of 2018 to ensure our products are optimally priced. We expect to provide an update on this trial on our next earnings call.

> First quarter of 2018 domestic business-to-business sales of $28 million was a record for us and exceeded our expectations, primarily due to continued success with our private label partner and traditional home medical equipment providers.

> *   *   *

> Looking ahead, I'm very proud of our Inogen associates and the progress made in what has historically been a seasonally slower quarter. While we've been engaged in multiple initiatives to fuel future growth, we've accelerated current growth, especially in the domestic direct-to-consumer and

business-to-business sales channels. I'm very pleased with the increased adoption in these markets with our best-in-class and patient-preferred products.

110. Defendant Wilkinson also touted the quality of the sales representatives Inogen hired in Cleveland, stating:

> Now on the direct-to-consumer side, the results are driven by our increased hiring. I mentioned that the hiring in Cleveland is going, I'll say, not according to plan, but ahead of plan. We found that it's a great market. We're very pleased with the talent that we're finding there. So it has allowed us to hire. If you were to compare our 3-year plan, we're ahead of that plan, if you look at it on a linear basis. And we hired pretty heavily at the end of last year. Those people are now contributing. As you go into the first quarter, you've got -- the very first people we hired actually are seasoned reps or at the end of curve. The people hired at the very end of the year are still relatively new in the first quarter, but they climbed that curve. So primarily, the results are based on our hiring increase. There's some productivity improvement in there. But if you looked at the contribution of productivity versus headcount and sales capacity, sales capacity is the bigger driver.

111. Defendant Bauerlein further commented on the Company's sales prospects, stating that "[w]e expect direct-to-consumer sales to be our fastest-growing channel" and "domestic business-to-business sales to have a significant growth rate."

112. During the question and answer section of the conference call, one analyst inquired about the "very quick[]" growth of business-to-business and the "long-term mix of business between [business-to-business] and direct-to-consumer." In response, defendant Bauerlein reiterated the Company's misleading sales growth and TAM penetration figures to assure investors that the mix between the two channels was irrelevant to Inogen's financial prospects. In particular, defendant Bauerlein stated:

1         Yes. So when you look at that, while certainly [business-to-business]
2   has a lower gross margin profile, it also has much lower operating expenses
3   associated with it.  So when we look at the market opportunity, we look to
4   capture share both on the B2B side and the direct-to-consumer side because
5   we're relatively agnostic on the bottom line. What we have been doing,
6   though, is continuing to invest in the B2C side because we're still very early
7   in the market penetration curve. As Scott said earlier, 9% or so penetration in
8   the last data as of the end of 2016, we still have a long -- we have a long ramp
9   to go to continue to take share both on the direct-to-consumer side as well as
10  the business-to-business side away from the tank-based business model. So
11  our focus really is to make sure that we maintain a market leadership position
12  and that we continue to grow the market both on direct-to-consumer side and
13  the B2B side and not to drive a specific mix in our business. Now inherent in
14  guidance in 2018 is that direct-to-consumer sales would be the fastest-
15  growing channel. So that would actually be a tailwind to gross margin
16  expansion over the course of the year.

17  **The Improper Statements in the April 30, 2018 Form 10-Q**

18      113.  On April 30, 2018, Inogen filed its Quarterly Report on Form 10-Q for the
19  period ended March 31, 2018 (the "Q1 2018 Form 10-Q") with the SEC.  Defendants
20  Wilkinson and Bauerlein signed the Q1 2018 Form 10-Q.  The Q1 2018 Form 10-Q
21  expressly incorporated by reference the description of the Company's business detailed
22  above in the Company's 2017 Form 10-K, and further specifically reiterated the following
23  concerning the TAM of its POCs:

24        Portable oxygen concentrators represented the fastest-growing segment
25  of the Medicare oxygen therapy market between 2012 and 2016. The
26  Company estimates based on 2016 Medicare data that the number of patients
27  using portable oxygen concentrators represents approximately 9.1% of the
28  total addressable oxygen market in the United States, although the Medicare

data does not account for private insurance and cash-pay patients in the market.

**The Improper Statements in the August 7, 2018 Press Release**

114.   On August 7, 2018, Inogen issued a press release announcing its second quarter of 2018 financial results for the period ended June 30, 2018.  In the press release, the Company announced "[r]ecord" second quarter revenues and increased sales growth. In particular, the press release stated:

**Second Quarter 2018 Highlights**

- Record total revenue of $97.2 million, up 51.6% over the same period in 2017
    - Record sales revenue of $92.0 million, up 58.5% over the same period in 2017
    - Rental revenue of $5.3 million, down 13.7% from the same period in 2017
- Increase in planned hiring in Cleveland by year-end 2020 to 500 employees, approximately two-thirds of which are expected to be sales representatives, up from the original target of 240 employees
- GAAP net income of $14.6 million, reflecting a 75.2% increase over the same period in 2017 and a 15.0% return on revenue
- Adjusted EBITDA of $19.0 million, representing 32.2% growth over the same period in 2017 and a 19.5% return on revenue (see accompanying table for reconciliation of GAAP and non-GAAP measures)
- Total units sold were 54,700, an increase of 22,300, or 68.8%, over the same period in 2017

115.   The Company also increased its fiscal year 2018 guidance based on its expectation of an increase in the sales growth rate.  In particular, the press release stated:

**Financial Outlook for 2018**

Inogen is increasing its full year 2018 total revenue guidance range to $340 to $350 million, up from $310 to $320 million, representing growth of 36.3% to 40.3% versus 2017 full year results. The Company continues to expect direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a significant growth rate, and international business-to-business sales to have a solid growth rate, where the 2018 strategy will continue to be heavily focused on the European markets. Inogen still expects rental revenue to be down approximately 10% in 2018 compared to 2017 as the Company continues to focus on sales.

Further, the Company is also increasing its full year 2018 GAAP net income and non-GAAP net income guidance range to $45 to $48 million, up from $38 to $41 million, representing growth of 114.3% to 128.5% compared to 2017 GAAP net income of $21.0 million and growth of 57.5% to 67.9% compared to 2017 non-GAAP net income of $28.6 million. The Company estimates that the decrease in provision for income taxes related to excess tax benefits recognized from stock-based compensation will lead to a reduction in provision for income taxes of approximately $12 million in 2018, up from $8 million, based on forecasted stock activity, which would lower its effective tax rate as compared to the U.S. statutory rate. The Company expects its effective tax rate including stock-based compensation deductions to vary quarter-to-quarter depending on the amount of pre-tax net income, share price, and on the timing and size of stock option exercises. Excluding the estimated $12 million decrease in provision for income taxes expected in 2018, the Company still expects a non-GAAP effective tax rate of approximately 25%.

Inogen is also increasing its guidance range for full year 2018 Adjusted EBITDA to $65 to $69 million, up from $62 to $67 million, representing 27.9% to 35.7% growth compared to 2017 results.

Inogen also still expects net positive cash flow for 2018 with no additional capital required to meet its current operating plan.

116.   As support for the increased guidance, defendant Wilkinson again credited the strong sales acumen of its salesforce.  In particular, he stated:

The second quarter of 2018 was a notably strong quarter for us as we generated record revenue across all three sales channels, while also reporting record operating income. … We are continuing to execute on our strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness as we believe this is still our most effective means to drive high revenue growth and portable oxygen concentrator adoption.

**The Improper Statements in the August 7, 2018 Earnings Conference Call**

117.   Also on August 7, 2018, the Company's executives held an earnings conference call with analysts and investors to discuss its second quarter of 2018 results. During the call, defendant Wilkinson continued to tout that Inogen's strong and growing direct-to-consumer sales were the result of the sales acumen of its growing salesforce.  In particular, he stated:

Given our recent success, our strategy is to continue to hire additional sales representatives and invest in advertising activities to increase consumer awareness, as we believe this is still our most effective means to drive growth of direct-to-consumer sales.

In fact, we now expect to have 500 Cleveland-based employees by year-end 2020, which is up from our original target of 240 employees. We expect at least 2/3 of these employees to be sales representatives.

\*   \*   \*

Looking ahead, I'm very proud of our Inogen associates and the progress made thus far in 2018. While we've been engaged in multiple initiatives to fuel future growth, we've accelerated our current growth,

especially in the domestic direct-to-consumer and business-to-business sales channels.  I'm very pleased with the increased adoption in these markets with our best-in-class and patient preferred products.

118.  Defendant Bauerlein confirmed that "[w]e still expect direct-to-consumer sales to be our fastest-growing channel, domestic business-to-business sales to have a significant growth rate and international business-to-business sales to have a solid growth rate, where the strategy will still be focused on the European market."

119.  During the question and answer session of the call, one analyst asked about the ramp-up of Inogen's sales facility.  In response, defendant Wilkinson stated, "[w]e are running a little bit ahead of our plan or schedule.  That's why we are increasing our own expectations as well as communication that over the 3-year period that we forecasted over that we would expect to have 500 people; about 2/3 of them would be sales personnel versus the original 240 people."

120.  Defendant Wilkinson trumpeted the purported quality of the sales representatives Inogen hired for its Cleveland facility, telling participants on the call that "[s]o far, I think we've done a great job.  We're very pleased with the quality of personnel that we've been able to attract."

121.  Defendant Bauerlein also attributed the strong direct-to-consumer performance to the Company's increase of competent sales representatives.  In particular, she stated:

> We have seen improved productivity across the facilities that have the seasoned reps, the California and Texas facilities, so that productivity is increasing, but of course, Cleveland is heavily influenced by the number of new reps in that facility.  So really, the increase is primarily associated with just the increased capacity and not a productivity improvement, particularly if you're just looking at a base of the total number of employees and how their productivity has changed year-over-year.

122.   In response to a question about "the sustainability of business-to-business," defendant Wilkinson reassured investors that POCs "will be the standard of care" over the next decade.  In particular, the exchange went as follows:

> [Analyst]: I was hoping you could talk about the sustainability of business-to-business. This is one that can be lumpy, but it does look like it's really moving in the direction of full adoption here. So I think what people would really like to better understand is, what inning are we in, in terms of adoption from the larger players, the middle sized and the smaller players? And how sustainable is it in the near term? And what could be [rallied] here in your opinion?

> [Defendant Wilkinson]: Yes. It's -- I just mentioned in the previous question that I think in the what inning we're in, second inning, maybe third inning, but certainly, we're in the first third of the game, if you will.

> As far as sustainability, I think that, that's a time horizon type of question, because over that 7 to 10 years, I mean, we absolutely believe POCs will be the standard of care and the end game is, there will be a conversion.

**The Improper Statements in the August 7, 2018 Form 10-Q**

123.   Also on August 7, 2018, Inogen filed its Quarterly Report on Form 10-Q for the period ended June 30, 2018 (the "Q2 2018 Form 10-Q") with the SEC.  Defendants Wilkinson and Bauerlein signed the Q2 2018 Form 10-Q.  In the Q2 2018 Form 10-Q, the Company expressly incorporated by reference the description of the Company's business detailed in the 2017 Form 10-K, specifically mentioning the TAM for POCs in the United States.  In particular, the Q2 2018 Form 10-Q stated:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. The Company estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare

data does not account for private insurance and cash-pay patients in the market.

**The Improper Statements During the September 12, 2018 Morgan Stanley Healthcare Conference**

124.   On September 12, 2018, the Company's executives presented at the Morgan Stanley Healthcare Conference on behalf of Inogen.  During the conference, one Morgan Stanley analyst asked, "So one of the things that kind of – one of the pushes you made is to drive a direct-to-consumer sales strategy and move away from the rental market.  Now what's the thought process there?  How that's beneficial?"  Defendant Wilkinson explained the reasoning behind Inogen's focus on direct-to-consumer cash sales, stating:

> Now as Jay said, over the last several years, we've shifted our focus from a rental business more to a retail business.  This really cuts out a lot of the red tape of the Medicare program.  It also – when you look at the reimbursement cuts that have been absorbed by Medicare, the retail sale is more compelling compared to rentals than they once were when the reimbursement was much higher.  So we've shifted our intake criteria and focus.  You have many patients that, when they call in, they've got a life-changing event where they're going to a wedding or the birth of a grandchild.  And so sometimes to go through the red tape of Medicare can be a cumbersome and lengthy process.  So there is a big retail opportunity, life-changing products.  People, we've proven, will definitely spend their own money to gain back their freedom and independence that they once had before their own oxygen.  So because of those dynamics, we've kind of shifted away from rental.  Although, we still have rentals in our business, it's still on our P&L, but our primary focus has been on the retail side over the last several years.  That's what's really driven the growth of our business.

125.   Defendant Bauerlein then went on to explain the basis for Inogen's confidence that its Cleveland facility was hiring high-quality sales representatives:

So as you said, we've substantially increased what we think we're going to do in the Cleveland facility, both in terms of sales reps as well as support personnel.  And we started – we actually opened the facility about a year ago, last August.  So we've had now about 12 months experience of hiring and training people in that facility.  And we've seen a great quality of reps and a great response to us wanting to enter the market and offer jobs there and that really is what's allowed us to say that we think we've been able to hire there and those people have come up the curve and produced what we wanted and obviously, you see that in our results.  And so because of that, we think that because the market penetration is still so small, it's important to capitalize on these market opportunities, particularly in the direct-to-consumer space.  So because of that, we're looking to expand that sales force more.  And we put a target out there that is based on our comfort level that we think that, that's an achievable goal by year-end 2020.

**The Improper Statements in the November 6, 2018 Press Release**

126.   On November 6, 2018, Inogen issued a press release announcing its third quarter of 2018 financial results for the period ended September 30, 2018.  In the press release, the Company highlighted "[t]otal revenue of $95.3 million, up 38.0% over the same period in 2017."  In particular, the press release stated:

**Third Quarter 2018 Financial Results**

Total revenue for the three months ended September 30, 2018 rose 38.0% to $95.3 million from $69.0 million in the same period in 2017. Direct-to-consumer sales rose 66.3% over the same period in 2017, primarily due to increased sales representative headcount and additional consumer advertising. Domestic business-to-business sales grew 32.0% over the same period in 2017, primarily driven by continued adoption by traditional home medical equipment providers and internet resellers. International business-to-business sales in the third quarter of 2018 increased 23.0% over the comparative period

- 56 -

in 2017, primarily due to continued adoption from the Company's European partners. Rental revenue in the third quarter of 2018 was $5.6 million compared to $5.9 million in the third quarter of 2017, representing a decline of 5.3% from the same period in the prior year. The decrease in rental revenue was primarily due to a decline in net rental patients on service of 13.0% compared to the third quarter of 2017, partially offset by higher revenue per patient on service. Rental revenue accounted for 5.9% of total revenue in the third quarter of 2018, down from 8.5% of total revenue in the third quarter of 2017.

Total gross margin was 51.2% in the third quarter of 2018 versus 48.1% in the comparative period in 2017. The increase in total gross margin was primarily due to a favorable mix shift towards direct-to-consumer sales revenue. Sales gross margin was 52.3% in the third quarter of 2018 versus 50.3% in the third quarter of 2017. The sales gross margin increase was primarily due a favorable mix shift of direct-to-consumer sales versus business-to-business sales, and lower average cost of goods sold per unit. This was partially offset by lower average selling prices in both business-to-business channels due to increased volumes and lower direct-to-consumer pricing effective June 1, 2018. Rental gross margin was 34.3% in the third quarter of 2018 versus 24.3% in the third quarter of 2017. The increase in rental gross margin was primarily due to increased rental revenue per patient and lower depreciation expense.

127.   Defendant Wilkinson commented in the press release, stating that "[t]he third quarter of 2018 was another successful quarter for us as we generated strong revenue across all three sales channels."  He added, "We are continuing to execute on our strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness as we believe this is still our most effective means to drive high revenue growth and portable oxygen concentrator adoption."

128.   The Company also increased its full year 2018 total revenue guidance range to "$345 to $355 million, up from $340 to $350 million, representing growth of 38.3% to 42.3% versus 2017 full year results."  The Company narrowed its "full year 2018 GAAP net income ... guidance range to $46 to $48 million, from $45 to $48 million, representing growth of 119.0% to 128.5% compared to 2017 GAAP net income."

129.   Inogen, however, also reduced its "guidance range for full year 2018 Adjusted EBITDA to $60 to $62 million, down from $65 to $69 million, representing growth of 18.0% to 22.0% versus 2017 full year results due to continued sales and marketing investments expected in the fourth quarter of 2018."  In the press release, the Company revealed that although direct-to-consumer growth rose to 66.3%, Inogen's domestic business-to-business sales growth was slowing and would see a significant deceleration to 32% growth from 56% in the second quarter of 2018.

**The Improper Statements in the November 6, 2018 Earnings Conference Call**

130.   Also on November 6, 2018, the Company's executives hosted an earnings conference call with investors and analysts to discuss its third quarter of 2018 results. During the call, defendant Wilkinson reiterated Inogen's direct-to-consumer sales growth resulting from the sales acumen of its salesforce.  In particular, he stated:

> Given our recent success, our strategy is to continue to hire additional sales representatives and invest in advertising activities to increase consumer awareness, as we believe this is still our most effective means to drive growth of direct-to-consumer sales.
>
> *   *   *
>
> Looking ahead to 2019, we expect to remain a high-growth company and to continue to invest heavily in our sales force, advertising efforts, and operations, in order to drive portable oxygen concentrator adoption worldwide.

131.   Emphasizing the strategy to focus Inogen's efforts on out-of-pocket cash sales to patients, to the near exclusion of the rental market, defendant Wilkinson noted that the

Company's "direct-to-consumer cash sales in 2017 grew significantly, while our direct rental patients on service declined."   As for Inogen's hiring of additional sales representatives, one analyst asked, "it still seems like the direct sales expense is growing at a pretty healthy level.  So I assume that means more sales reps.  Why is that right or wrong?"  In response, defendant Bauerlein stated:

> Yes. So as we said on the last quarter call, we are ahead of our expectations on the hiring side. Cleveland has been a great market for us to expand our sales base, and we are expanding that sales base and continued to do that in the third quarter. And really, we do that because we know that there is a known return on those types of investments, and we are still early in the stages of POC penetration.

132.   Another analyst asked the defendants about the market saturation of patients, specifically "into that pool of patients willing to buy out-of-pocket ... [a]nd are you seeing any kind of signs of saturation of this pool of patients that are at least willing to buy out-of-pocket?"  In response, defendant Wilkinson reaffirmed that in addition to the Medicare data, other metrics the Company monitors supported the defendants' claims that there is no market saturation.  In particular, defendant Wilkinson stated:

> Yes. I mean, we do monitor all of those metrics. And I mean, obviously, we're confident when we're making these investments that we're not at a point where you're at saturation. And certainly, the Medicare numbers bear that out. Our other metrics bear that out. Otherwise, we wouldn't make such an investment.

133.   When another analyst asked about Inogen's plans for adding sales representatives for the direct-to-consumer business, defendant Bauerlein responded that "we still are cautious there of trying to, again, make sure we don't get out ahead of how many people we can hire and effectively train.  So that's built into our models is looking at how many we can hire?  How many will leave?  What is the ramp-up curve?  All of that is factored into that guidance."

134.   Defendant Bauerlein sought to temper the Company's lowered income guidance by attributing it to the increased sales and marketing investment to support the new sales representatives in the Cleveland facility, which she assured investors would bear fruit in the future.  In particular, defendant Bauerlein stated:

> So the level of investment, clearly, was higher than we had thought on the second quarter call, because of the ramp that we've seen on the sales reps and the number of people we have in the facility, and then the related media spend. So that has come in ahead of what we expected on the second quarter call, which of course, leads to higher expenses in the near term. But we think that that's the right decision. So while we did lower adjusted EBITDA, it's really for those sales and marketing expenses. So we expect those sales and marketing expenses to also be higher in the fourth quarter, and they also were higher in the third quarter as well. So those 2 items combined really account for the changes that we're seeing in adjusted EBITDA.

135.   Concerning the Company's fiscal year 2018 financial guidance, defendant Bauerlein stated that the Company still expected direct-to-consumer sales to be its "fastest-growing channel," adding that domestic business-to-business sales would still have a "significant growth rate" and that international business-to-business sales would have a "solid growth rate."

136.   Defendant Bauerlein also represented that the guidance reduction should not be a major concern because traditionally fourth quarter sales slowed in prior years.  In particular, she stated:

> So when we look at the Q4 expectation, obviously, it does assume a deceleration there of the growth rate. Now remember, Q4, also last year, was strong for us on the direct-to-consumer side, against the typical seasonality where we see, typically, the stronger months are actually Q2 and then followed by Q3. So the comps get tougher on the direct-to-consumer side

going into Q4 because of that. So I want to make sure people understand that. Obviously, as we've continued to hire, that also helps offset that.

137.   In the slides Inogen released with its financial results, the Company continued to report that the TAM grew at a rate of 7% to 10% annually, and increased its estimate to four million Americans on long-term oxygen therapy by the year 2020 from its current estimate of three million Americans.   To justify Inogen's long-term oxygen therapy estimate, the slides referenced the defendants' estimate of approximately thirty million Americans living with COPD.   These numbers, however, were inflated given that the defendants' had doubled the CDC's estimate by using an outdated 1988-1994 CDC study, which merely found that 50% of COPD patients did not know they had COPD at the time of diagnosis.   The slides also boasted that Inogen had "[h]igh standards of compliance and regulations," with respect to its license "to sell directly to patients & bill Medicare in [all] 50 states & [the] District of Columbia."

**The Improper Statements in the November 6, 2018 Form 10-Q**

138.   On November 6, 2018, Inogen filed its Quarterly Report on Form 10-Q for the period ended September 30, 2018 (the "Q3 2018 Form 10-Q") with the SEC. Defendants Wilkinson and Bauerlein signed the Q3 2018 Form 10-Q.   In the Q3 2018 Form 10-Q, the Company expressly incorporated by reference the description of the Company's business detailed in the 2017 Form 10-K, and increased the Company's POC adoption figures purportedly based on 2017 Medicare data.   In particular, the Q3 2018 Form 10-Q stated:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2017. The Company estimates based on 2017 Medicare data that the number of patients using portable oxygen concentrators represents approximately 10.8% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

**The Improper Statements During the January 9, 2019 JPMorgan Global Healthcare Conference**

139.  On January 9, 2019, the defendants participated in the JPMorgan Global Healthcare Conference.  During the conference, defendant Wilkinson proclaimed that TAM estimates from other companies were inaccurate because "we've seen some people actually make some errors in market assessment because they don't fully understand the data."  Defendant Wilkinson also described the penetration of POCs into the long-term oxygen therapy market as in its infancy, stating:

> Now in the U.S., the penetration of POCs, it's still really in its infant stages despite the compelling benefits for a patient, giving them freedom and mobility as well as the low total cost service. The penetration in 2017, and that's the latest Medicare data available, is 2017, was about 11%. And you can kind of see at the bottom of the screen how that's progressed over the last several years. From '14 through '17, we've gone 7%, 8%, 9%, 11%. So POCs are actually the fastest-growing modality within oxygen therapy. But the market is still largely underpenetrated.

> Our estimate is that over time, that POCs or portable oxygen concentrators will replace the tanks. And essentially, we've said, "90% of the patients that are ambulatory would be given a POC. If you assume that, believe that assumption, then it's 90% of the 73% ambulatory patients which means that at the end of the day, full penetration would be 65%." So again, we're a long way from the end of curve that's why we're bullish on continued investment in expanding our sales force.

140.  In the Company's slides used during the presentation, the Company referenced its estimate of approximately thirty million Americans living with COPD.  These numbers, however, were inflated given that the defendants' had doubled the CDC's estimate by using an outdated 1988-1994 CDC study, which merely found that 50% of COPD patients did not know they had COPD at the time of diagnosis.  Defendants further represented that within fifteen years, the WHO projected COPD would become the leading cause of death

in the world.

## THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN THE COMPANY'S 2018 AND 2019 PROXY STATEMENTS

141.   Plaintiff's allegations with respect to the misleading statements in the 2018 and 2019 Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.   Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

142.   On March 27, 2018, the Company issued its 2018 Proxy Statement filed on Form DEF 14A with the SEC (the "2018 Proxy") for the 2018 Annual Meeting of Stockholders, which was held on May 10, 2018.   In the 2018 Proxy, defendants Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland, Rider, and Wilkinson solicited stockholder votes to, among other things, to reelect defendants Beardsley, Greer, and Rider to the Board.

143.   On March 26, 2019, the Company issued its 2019 Proxy Statement filed on Form DEF 14A with the SEC (the "2019 Proxy") for the 2019 Annual Meeting of Stockholders, which was held on May 9, 2019.   In the 2019 Proxy, defendants Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland, Rider, and Wilkinson solicited stockholder votes to, among other things, to reelect defendants Anderson-Ray, McFarland, and Wilkinson to the Board.

144.   In support of defendants Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland, Rider, and Wilkinson's bid to reelect defendants Anderson-Ray, Beardsley, Greer, McFarland, Rider, and Wilkinson to the Board, these defendants highlighted their purported Corporate Governance Principles and Code.   In particular, both the 2018 Proxy and 2019 Proxy (collectively, the "Proxies") stated:

**Corporate Governance Principles and Code of Ethics and Conduct**

Our Board has adopted Corporate Governance Principles. These principles address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general.  In addition, our Board has adopted a Code of Ethics and Conduct that applies to all of our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers.

145.    In addition, the Proxies each assured stockholders that the Board and its committees regularly assess and manage the risks that Inogen faces, including legal and regulatory risks, and risks associated with internal controls over financial reporting and disclosure controls and procedures.  In particular, the Proxies stated:

**Risk Management**

Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, and reputational.  We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of risks the Company faces, while our Board, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

Our Board believes that open communication between management and our Board is essential for effective risk management and oversight.  Our Board meets with our Chief Executive Officer and other members of the senior management team at quarterly meetings of our Board as well as at such other times as they deem appropriate, where, among other topics, they discuss strategy and risks facing the Company.

While our Board is ultimately responsible for risk oversight, our Board committees assist our Board in fulfilling its oversight responsibilities in certain areas of risk. Our Audit Committee assists our Board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, legal and regulatory compliance, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our Audit Committee also reviews our major financial risk exposures and the steps management has taken to monitor and control these exposures. In addition, our Audit Committee monitors certain key risks on a regular basis throughout the fiscal year, such as risk associated with internal control over financial reporting and liquidity risk. Our Compensation, Nominating and Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with Board organization, membership and structure, and corporate governance. Our Compensation, Nominating and Governance Committee also oversees risks related to our compensation policies to ensure that our compensation programs do not encourage unnecessary risk-taking. Finally, our full Board reviews strategic and operational risk in the context of reports from the management team, receives reports on all significant committee activities at each regular meeting, and evaluates the risks inherent in significant transactions.

146. The Proxies thus assured stockholders that the Board abided by Inogen's Corporate Governance Principles and Code, and actively monitored the Company's risks and internal controls. In reality, the Board utterly failed in its oversight duties by allowing the Company to engage in abusive sales practices, operate with inadequate internal controls, and issue materially misleading statements to the investing public.

147.   The Proxies harmed Inogen by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.  As a result of the misleading statements therein, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Anderson-Ray, Beardsley, Greer, McFarland, Rider, and Wilkinson.

## THE TRUTH BEGINS TO EMERGE

148.   The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on February 8, 2019, when Muddy Waters published a report revealing Inogen's "egregiously false narrative" about the size of its TAM.  Specifically, the report disputed Inogen's previously reported 2.5 to 3 million TAM, and instead disclosed that Inogen's TAM was only 1.3 million.  In particular, the report stated:

> Muddy Waters is short Inogen, Inc. (INGN) because we believe management has created an egregiously false narrative about the Total Addressable Market ("TAM") size and growth. We estimate that the U.S. market is 1.3 million users. The data shows us that the market is actually shrinking.

> \*   \*   \*

> The INGN management estimates are actually the work of an obscure research firm called WinterGreen Research, Inc. We reviewed the 2017 WinterGreen report, and frankly feel it is middle school student quality, replete with misspellings, poor grammar, bizarre statements of fact, and even outright plagiarism from the New York Times. INGN management should know better than to take WinterGreen's work as authoritative.

> \*   \*   \*

> We calculate the real U.S. TAM is presently approximately only 1.3 million users, which is 57% lower than management's claim. Our estimate is derived from Centers for Medicare & Medicaid Services ("CMS") data. CMS

data also shows the oxygen therapy market has been shrinking. We estimate that from 2010 to 2017, the market shrank at a CAGR of -2.6%. This is a far cry from the estimates of 7% - 10% positive growth the company has been making since November 2013. In our view, management has created a false narrative by presenting poorly-sourced estimates along with misrepresenting data from credible sources.

149.   According to the Muddy Waters report, the means of arriving at the TAM and growth projections touted by Inogen involved "three layers of numerical manipulation," by selectively ignoring sources of data, cherry-picking Medicare statistics, and ignoring the interaction between Inogen's own two sales channels.   Specifically, the Company's projections failed to account for the portion of ambulatory oxygen patients who are not candidates for POCs, and also the three-year Medicare cap on oxygen devices.   These factors led Muddy Waters to expect, contrary to the Company's projected 7% to 10% annual growth, that Inogen sales would "peak no later than next year."

150.   Shortly thereafter, on February 12, 2019, Citron published a bearish report on Inogen revealing the Company's abusive sales practices titled "Citron Exposes Elder Abuse Within Inogen's Sales Tactics."   Citron cited Inogen's "dirty" reseller network and systematic abuse of elders by the Company and resellers through deceptive sales practices, adding that less than 10% of its sales came from Medicare despite the average age of its customers being seventy-five and over.   According to the Citron report, Inogen had conspired with its reseller network to dominate Google listings and posted fake reviews online.   Inogen also used tactics to deceive and pressure the elderly into buying its POCs by, among other things, falsely telling them that Medicare would not cover the cost of POCs sold by other companies in order to induce them to purchase Inogen's devices at inflated prices.

151.   In addition, the Citron report revealed that the Company's top reseller, 1st Class Medical, "is secretly controlled by a convicted felon who was recently released after 5 years in federal prison for deceptive internet marketing practices," similar practices that

Inogen and its reseller network engaged in, according to the report.  The Citron report then detailed how increased sales through these reseller networks had artificially increased Inogen's business-to-business sales, increases that Citron noted would not be sustainable on a long-term basis.

152.   The Citron report also stated that "Inogen's [direct-to-consumer] business is running out of air," due in large part on its failure to invest in research and development and instead focus its efforts on sales.  In particular, the Citron report stated:

> [Direct-to-consumer] is Inogen's highest margin channel, which is why the sales force has been trained to upsell Medicare patients to cash pay.

> While competitors have invested in R&D (e.g., ResMed's recent investment in remote patient monitoring), Inogen has invested in its sales force.

153.   Undaunted by the bearish news, the defendants continued to make improper statements concerning the Company's market growth and sales practices.  Specifically, during the Company's February 26, 2019 earnings conference call with analysts and investors to discuss its fourth quarter and fiscal year 2018 financial results, defendant Wilkinson took the opportunity to dispute the findings uncovered by Muddy Waters and Citron.  In particular, defendant Wilkinson stated:

> [R]educed reimbursement rates as a result of competitive bidding, enhanced Medicare coverage and billing requirements and other factors have created access issues and caused the cash pay market, which is not reflected in the Medicare data, to grow substantially for both new and existing patients.

> Additionally, the industry is going through a major conversion from tank deliveries to POCs. We believe that the combination of these factors should lead to growth rates for POCs above the overall long-term oxygen therapy market growth rate over the next 5-plus years.

> Lastly, we are an accredited home care provider, licensed to provide respiratory products in all 50 states, heavily regulated by Medicare and the

FDA and subject to frequent audits to maintain these accreditations and licenses and we take compliance with the law seriously.

Specifically, we have compliance requirements in place for our authorized Internet resellers. And without commenting on any specific Internet resellers, we expect that our Internet resellers abide by all applicable laws and regulations. We believe this is common practice in our industry, as our Internet resellers also sell most competitive POCs in the market today as well as other home care products.

154.   During the same call, defendant Wilkinson touted the Company's direct-to-consumer sales force and marketing team, describing them as a "fantastic asset."

155.   That same day, Inogen filed its 2018 Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Form 10-K") with the SEC  The 2018 Form 10-K was signed by defendants Wilkinson, Bauerlein, Lukatch, Anderson-Ray, Rider, McFarland, Greer, Beardsley, and Huggenberger.  The 2018 Form 10-K decreased the Company's previous expected rate of oxygen therapy patient growth from 7% to 10% to the "low single digits."  In particular, the 2018 Form 10-K stated:

While there is no up-to-date single source of long-term oxygen therapy market data, based on market data from various industry sources and our own internal data, we believe that growth in the number of oxygen therapy patients in the United States was low single digits in 2017, and we now expect that trend to continue for the next few years.

156.   On this news, Inogen's stock price plummeted $33.78 per share, or 24.12%, to close at $106.28 per share on February 27, 2019, from the previous trading day's closing price of $140.06 per share, a market capitalization loss of over $736 million in one day.

157.   On February 28, 2019, *Medtech Insight* published an article titled "Inogen's Stock Collapses After Earnings Call Addressing Short-Seller Concerns."  The article noted that Inogen's stock price "plummeted after its most recent earnings call where the company's CEO seemed to acknowledge it did not trust its own research firm that gave it

a glowing market report and prospective analysis." The *Medtech Insight* article also quoted the Muddy Waters report, attributing the decline in share price "to the evasiveness of TAM size, their assessment of recent low single digit growth, and downshifting the long-term growth language to five years from 7-10."

158.  Finally, on May 7, 2019, Inogen issued a press release announcing its first quarter of 2019 financial results for the period ended March 31, 2019.  Defendant Wilkinson commented in the press release, disclosing that despite Inogen's intentional shift away from the Medicare rental reimbursement market, the shift was actually a major headwind in generating future revenue.  Even worse, business-to-business sales continued to decrease.  In particular, defendant Wilkinson stated:

> The first quarter of 2019 was a tough quarter for us given the decline in domestic business-to-business sales and the increased direct-to-consumer sales and marketing expenditures. … We believe there is still a large opportunity for portable oxygen concentrator adoption worldwide; however, there are patient access issues given the current reimbursement environment and the restructuring challenges that some providers are facing in converting their oxygen business to a non-delivery model. As a result, we are focused on multiple initiatives to drive sales and marketing efficiencies and build a more predictable revenue stream over time.

159.  The press release announced a further reduction of the Company's 2019 total revenue guidance, revealing that the POC market was not as strong as the defendants previously described.  In particular, the press release stated:

> Inogen is reducing its full year 2019 total revenue guidance to $405 to $415 million, down from $430 to $440 million, representing growth of 13.1% to 15.9% versus 2018 full year results. While the Company still expects direct-to-consumer sales to be its fastest growing channel, it plans to slow the pace of hiring in 2019 and place more emphasis on sales representative productivity. Inogen still expects international business-to-business sales to

have a solid growth rate, but now expects domestic business-to-business sales to have a slightly negative growth rate. Given the difficult growth comparisons Inogen faces in the domestic business-to-business channel, the restructuring challenges of some providers, and its rental plan, it expects negative growth in the domestic business-to-business channel in the second quarter of 2019 compared to the second quarter of 2018, with modest growth in the back half of 2019 compared to the back half of 2018.

160.   Also on May 7, 2019, Inogen held an earnings conference call with investors and analysts to discuss the dismal first quarter of 2019 financial results.  During the call, defendant Wilkinson disclosed that the new sales representatives were not as effective as earlier hires, and alerted investors to additional issues in both the direct-to-consumer and business-to-business markets.  In particular, he stated:

Looking at the first quarter of 2019, we generated total revenue of $90.2 million, reflecting growth of 14.1% over the first quarter of 2018.

Direct-to-consumer sales of $39 million in the first quarter of 2019 increased 35.9% over the first quarter of 2018 primarily due to increased sales representative headcount and associated consumer advertising. ***However, the sales reps we hired in the second half of 2018, on average, took longer to come up the productivity curve than our historical target and were not at their full potential in the first quarter.***

Moving forward, we plan to slow down the addition of new sales representative hires and focus on improving the productivity of our sales team. Over the last 2 quarters, we have also applied with it a separate rental team that will focus exclusively on new rental additions to drive overall sales productivity. And we plan to roll this out across our entire group in the coming quarters.

As we've continued to grow our sales staff and the associated number of required leads has grown, we have seen the cost per generated lead trend

higher than historical averages. We believe we will see increased productivity of our sales reps throughout 2019, which should reduce our overall cost per sale despite expected increased marketing spend.

First quarter 2019 domestic business-to-business sales of $26.1 million decreased 7% from the first quarter of 2018 primarily due to a decline in sales to our private label partner. These sales declines were a partner due to one large national home care provider who significantly reduced orders in the first quarter of 2019 as compared to the same period in 2018.

Specifically, this provider who we discussed in our last earnings call accounted for revenue of $700,000 in the first quarter of 2019, down from $9.3 million in the first quarter of 2018.

161.   During the conference call, the defendants retreated from their previous misleading assurances that Inogen could achieve its growth by focusing on sales within the direct-to-consumer and business-to-business markets by announcing that they had created a separate rental team.   Defendant Wilkinson informed investors that "[w]e do plan to slightly change our rental intake criteria to accept more new rental patient additions to increase access to patients who otherwise could not obtain a POC from their current home care provider."

162.   In contrast to the defendants' earlier praise of Inogen's Cleveland salesforce, defendant Wilkinson confirmed that the sales representatives hired in the third quarter of 2018 were underperforming and also blamed the productivity issues on insufficient support from the Cleveland management and seasoned representatives.   In particular, defendant Wilkinson stated:

Let me back up to probably the first half of '18 is kind of a benchmark. We started to hire at a heavier rate than historical in the first half of the year. And things, I'll say, that even exceeded our expectations. As we continued and actually cranked up hiring to an even higher rate as we went into the third quarter, that's where things didn't meet our expectations. And as I said in my

prepared remarks, when we look at productivity of reps, they no longer were matching what we have seen from a historical productivity standpoint. We got a little bit ahead of ourselves on management. I think we mentioned that in the previous call that we had to shore up our management but we found that we still need to invest in further training on management so that there are even better resource for the new reps that we have. If you look at most of the incremental hiring is in our Cleveland facility. That's where we have space. So that's why most of the hiring is there. But the folks are not surrounded by 5-year veteran reps there. It's a relatively new facility. So we need to make an even bigger investment into training and support of those new reps to drive that productivity.

163.   On this news, Inogen's stock price dropped $23.35 per share, or 25.62%, to close at $67.79 per share on May 8, 2019, from the previous trading day's closing price of $91.14 per share, a market capitalization loss of over $512 million in one day.

## REASONS THE STATEMENTS WERE IMPROPER

164.   The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)   the Company overstated the true size of the TAM for its POCs, claiming the TAM was upwards of three million people;

(b)   the Company misrepresented the basis for its calculation of the TAM;

(c)   the Company misrepresented the market penetration of POCs;

(d)   the Company falsely attributed its sales growth to the sales acumen of its salesforce, when in truth the sales growth was due in large part to deceptive sales tactics designed to deceive Inogen's elderly customer base;

(e)   as such, Inogen's domestic business-to-business sales growth to HME providers was inflated and unsustainable;

(f)     very little of Inogen's business came from the more stable Medicare market; and

(g)     as a result of the foregoing, the Individual Defendants' representations concerning Inogen's business, operations, and financial prospects were improper.

## INSIDER SALES BY DEFENDANTS

165.   Rather than providing the market with correct information, the Insider Selling Defendants, defendants Huggenberger, Myers, Bauerlein, Wilkinson, Taylor, Scribner, Rider, McFarland, Lukatch, and Anderson-Ray, used their knowledge of Inogen's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Inogen, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health. While in possession of this knowledge:

166.   Defendant Huggenberger sold 120,106 shares of his personally held Inogen stock for proceeds of over $19.7 million.  Defendant Huggenberger's sales were timed to maximize profit from Inogen's then artificially inflated stock price.    Defendant Huggenberger's sales are also suspicious given that his stock sales represented nearly 94% of his holdings as demonstrated by the table below.  Further, since his sales on January 15, 2019, defendant Huggenberger has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 6,808 |
| Shares Sold During the Sales Period ("SP") | 120,106 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 127,903 |
| Shares Remaining SP | 7,797 |
| **Total Proceeds from Sales** | **$19,763,206.02** |
| **% of Total Ownership Sold During SP** | **93.90%** |

167.   Defendant Myers sold 102,099 shares of his personally held Inogen stock for proceeds of over $17.1 million.  Defendant Myers' sales were timed to maximize profit from Inogen's then artificially inflated stock price.  While a majority of defendant Myers' sales were effected pursuant to a Rule 10b5-1 trading plan, he adopted that plan on March 2, 2018 (57,099 shares sold), after the improper statements began.  Defendant Myers' sales

are also suspicious given that his stock sales represented over 70% of his holdings as demonstrated by the table below.  Further, since his sales on August 9, 2018, defendant Myers has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 38,600 |
| Shares Sold During SP | 102,099 |
| Shares Disposed (Other) During SP | 3,918 |
| Total Shares Held During SP | 144,922 |
| Shares Remaining SP | 38,905 |
| **Total Proceeds from Sales** | **$17,114,934.11** |
| **% of Total Ownership Sold During SP** | **70.45%** |

168.   Defendant Bauerlein sold 84,260 shares of her personally held Inogen stock for proceeds of over $10.5 million.  Defendant Bauerlein's sales were timed to maximize profit from Inogen's then artificially inflated stock price.  While all of defendant Bauerlein's sales were effected pursuant to a Rule 10b5-1 trading plan, she adopted that plan on November 10, 2017, after the improper statements began.  Defendant Bauerlein's sales are also suspicious given that her stock sales represented over 72% of her holdings as demonstrated by the table below.  Further, since her sales on June 11, 2018, defendant Bauerlein has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 84,260 |
| Shares Disposed (Other) During SP | 2,445 |
| Total Shares Held During SP | 115,904 |
| Shares Remaining SP | 29,199 |
| **Total Proceeds from Sales** | **$10,578,748.94** |
| **% of Total Ownership Sold During SP** | **72.70%** |

169.   Defendant Wilkinson sold 57,037 shares of his personally held Inogen stock for proceeds of over $8.5 million.  Defendant Wilkinson's sales were timed to maximize profit from Inogen's then artificially inflated stock price.  Defendant Wilkinson's sales are also suspicious given that his stock sales represented over 57% of his holdings as demonstrated by the table below.  Further, since his sales on August 1, 2018, defendant Wilkinson has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 43,763 |
| Shares Sold During SP | 57,037 |
| Shares Disposed (Other) During SP | 6,478 |
| Total Shares Held During SP | 99,976 |
| Shares Remaining SP | 36,461 |
| **Total Proceeds from Sales** | **$8,555,054.39** |
| **% of Total Ownership Sold During SP** | **57.05%** |

170.   Defendant Taylor sold 50,000 shares of his personally held Inogen stock for proceeds of over $8.3 million.  Defendant Taylor's sales were timed to maximize profit from Inogen's then artificially inflated stock price.  While all of defendant Taylor's sales were effected pursuant to a Rule 10b5-1 trading plan, he adopted that plan on November 10, 2017, after the improper statements began.  Defendant Taylor's sales are also suspicious given that his stock sales represented over 45% of his holdings as demonstrated by the table below.  Further, since his sales on October 1, 2018, defendant Taylor has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 34,824 |
| Shares Sold During SP | 50,000 |
| Shares Disposed (Other) During SP | 1,388 |
| Total Shares Held During SP | 110,330 |
| Shares Remaining SP | 58,942 |
| **Total Proceeds from Sales** | **$8,388,654.81** |
| **% of Total Ownership Sold During SP** | **45.32%** |

171.   Defendant Scribner sold 17,000 shares of his personally held Inogen stock for proceeds of over $2.4 million.  Defendant Scribner's sales were timed to maximize profit from Inogen's then artificially inflated stock price.  Defendant Scribner's sales are also suspicious given that his stock sales represented 73.5% of his holdings as demonstrated by the table below.  Further, since his sales on September 17, 2018, defendant Scribner has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 4,464 |
| Shares Sold During SP | 17,000 |
| Shares Disposed (Other) During SP | 526 |
| Total Shares Held During SP | 23,121 |
| Shares Remaining SP | 5,595 |
| **Total Proceeds from Sales** | **$2,402,111.82** |
| **% of Total Ownership Sold During SP** | **73.53%** |

172.   Defendant Rider sold 9,722 shares of her personally held Inogen stock for proceeds of over $1.6 million.  Defendant Rider's sales were timed to maximize profit from Inogen's then artificially inflated stock price.  While all of defendant Rider's sales were effected pursuant to a Rule 10b5-1 trading plan, she adopted that plan on either November 21, 2017 (7,472 shares sold) or March 2, 2018 (2,250 shares sold), after the improper statements began.  Defendant Rider's sales are also suspicious given that her stock sales represented nearly 71% of her holdings as demonstrated by the table below.  Further, defendant Rider did not sell any Inogen stock in the sales periods prior to when the improper statements began on November 8, 2017, nor after the truth was fully revealed on May 7, 2019.

| Total Shares Before Sales | 3,000 |
|---|---|
| Shares Sold During SP | 9,722 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 13,711 |
| Shares Remaining SP | 3,989 |
| **Total Proceeds from Sales** | **$1,696,905.79** |
| **% of Total Ownership Sold During SP** | **70.91%** |

173.   Defendant McFarland sold 8,125 shares of his personally held Inogen stock for proceeds of over $1.3 million.  Defendant McFarland's sales were timed to maximize profit from Inogen's then artificially inflated stock price.   While all of defendant McFarland's sales were effected pursuant to a Rule 10b5-1 trading plan, he adopted that plan on November 29, 2017, after the improper statements began.  Defendant McFarland's sales are also suspicious given that his stock sales represented over 89% of his holdings as demonstrated by the table below.  Further, defendant McFarland did not sell any Inogen stock in the sales periods prior to when the improper statements began on November 8, 2017, nor after the truth was fully revealed on May 7, 2019.

| Total Shares Before Sales | 3,125 |
|---|---|
| Shares Sold During SP | 8,125 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 9,114 |
| Shares Remaining SP | 989 |
| **Total Proceeds from Sales** | **$1,390,889.26** |
| **% of Total Ownership Sold During SP** | **89.15%** |

174.   Defendant Lukatch sold 8,000 shares of his personally held Inogen stock for proceeds of over $1.2 million.  Defendant Lukatch's sales were timed to maximize profit from Inogen's then artificially inflated stock price.  Defendant Lukatch's sales are also suspicious given that his stock sales represented 89% of his holdings as demonstrated by the table below.  Further, since his sales on November 6, 2018, defendant Lukatch has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 8,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 8,989 |
| Shares Remaining SP | 989 |
| **Total Proceeds from Sales** | **$1,248,309.15** |
| **% of Total Ownership Sold During SP** | **89.00%** |

175.   Defendant Anderson-Ray sold 4,000 shares of his personally held Inogen stock for proceeds of $689,980.  Defendant Anderson-Ray's sales were timed to maximize profit from Inogen's then artificially inflated stock price.  Defendant Anderson-Ray's sales are also suspicious given that his stock sales represented over 40% of his holdings as demonstrated by the table below.  Further, since his sales on October 1, 2018, defendant Anderson-Ray has not sold a single share of Inogen stock.

| | |
|---|---|
| Total Shares Before Sales | 4,896 |
| Shares Sold During SP | 4,000 |
| Shares Disposed (Other) During SP | 380 |
| Total Shares Held During SP | 9,885 |
| Shares Remaining SP | 5,505 |
| **Total Proceeds from Sales** | **$689,980.00** |
| **% of Total Ownership Sold During SP** | **40.47%** |

176.   In sum, the Insider Selling Defendants sold over $71 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **ANDERSON-RAY** Current Director | 1/2/2018 | 1,000 | $119.06 | $119,060.00 |
| | 4/17/2018 | 1,000 | $139.82 | $139,820.00 |
| | 7/2/2018 | 1,000 | $184.88 | $184,880.00 |
| | 10/1/2018 | 1,000 | $246.22 | $246,220.00 |
| | | 4,000 | Total (Sales) | $689,980.00 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BAUERLEIN** **Current Executive VP of Finance, Chief Financial Officer, Corporate Secretary, Treasurer, and Co-Founder** | 2/9/2018 | 8,213 | $115.63 | $949,693.01 |
| | 2/9/2018 | 3,505 | $116.42 | $408,058.41 |
| | 2/12/2018 | 3,197 | $115.25 | $368,442.42 |
| | 2/12/2018 | 2,927 | $116.26 | $340,293.31 |
| | 2/12/2018 | 7,120 | $117.45 | $836,217.66 |
| | 2/12/2018 | 2,668 | $118.13 | $315,162.30 |
| | 2/14/2018 | 9,737 | $120.05 | $1,168,927.82 |
| | 2/15/2018 | 1,982 | $120.10 | $238,028.49 |
| | 2/16/2018 | 8,808 | $125.03 | $1,101,271.29 |
| | 2/20/2018 | 2,992 | $125.35 | $375,055.28 |
| | 2/20/2018 | 200 | $126.26 | $25,252.00 |
| | 2/21/2018 | 8,700 | $130.33 | $1,133,843.16 |
| | 2/21/2018 | 2,600 | $131.41 | $341,675.10 |
| | 2/21/2018 | 700 | $132.46 | $92,721.51 |
| | 3/8/2018 | 10,305 | $124.18 | $1,279,632.65 |
| | 3/8/2018 | 4,594 | $124.88 | $573,694.59 |
| | 3/8/2018 | 1,012 | $125.84 | $127,345.32 |
| | 6/11/2018 | 259 | $178.83 | $46,316.71 |
| | 6/11/2018 | 2,898 | $180.19 | $522,179.32 |
| | 6/11/2018 | 1,220 | $181.40 | $221,304.58 |
| | 6/11/2018 | 623 | $182.40 | $113,634.02 |
| | | 84,260 | **Total (Sales)** | $10,578,748.94 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **HUGGENBERGER** **Current Director and Former Chief Executive Officer and President** | 11/15/2017 | 12,800 | $118.22 | $1,513,171.20 |
| | 11/15/2017 | 1,200 | $118.82 | $142,586.04 |
| | 12/15/2017 | 3,100 | $118.61 | $367,691.93 |
| | 12/15/2017 | 3,930 | $119.60 | $470,029.97 |
| | 12/15/2017 | 4,982 | $120.43 | $599,999.20 |
| | 12/15/2017 | 1,988 | $121.28 | $241,106.43 |
| | 1/16/2018 | 13,000 | $116.19 | $1,510,477.80 |
| | 6/15/2018 | 10,444 | $183.50 | $1,916,474.00 |
| | 7/16/2018 | 616 | $191.87 | $118,188.84 |
| | 7/16/2018 | 2,484 | $192.92 | $479,217.75 |
| | 7/16/2018 | 1,594 | $194.30 | $309,712.29 |
| | 7/16/2018 | 4,199 | $195.17 | $819,536.05 |
| | 7/16/2018 | 1,200 | $195.98 | $235,178.76 |
| | 7/16/2018 | 500 | $197.29 | $98,645.00 |
| | 8/15/2018 | 706 | $226.30 | $159,767.09 |
| | 8/15/2018 | 3,178 | $227.18 | $721,993.61 |
| | 8/15/2018 | 1,110 | $228.57 | $253,711.04 |
| | 8/15/2018 | 3,701 | $229.43 | $849,117.47 |
| | 8/15/2018 | 1,605 | $230.43 | $369,843.20 |
| | 8/15/2018 | 200 | $231.07 | $46,213.70 |
| | 9/14/2018 | 904 | $279.47 | $252,638.89 |
| | 9/14/2018 | 596 | $280.53 | $167,196.65 |
| | 9/14/2018 | 2,374 | $281.50 | $668,282.42 |
| | 9/14/2018 | 3,140 | $282.60 | $887,358.03 |
| | 9/14/2018 | 1,095 | $283.63 | $310,576.05 |
| | 9/14/2018 | 1,751 | $284.63 | $498,381.18 |
| | 9/14/2018 | 640 | $285.28 | $182,577.41 |
| | 10/15/2018 | 1,390 | $194.96 | $270,996.07 |
| | 10/15/2018 | 3,174 | $195.87 | $621,702.81 |
| | 10/15/2018 | 3,796 | $196.89 | $747,376.60 |
| | 10/15/2018 | 1,440 | $197.85 | $284,901.41 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 10/15/2018 | 360 | $198.71 | $71,535.38 |
| | 10/15/2018 | 340 | $200.14 | $68,047.57 |
| | 11/15/2018 | 1,240 | $127.34 | $157,901.60 |
| | 11/15/2018 | 1,728 | $128.66 | $222,324.48 |
| | 11/15/2018 | 3,868 | $129.20 | $499,745.60 |
| | 11/15/2018 | 1,933 | $130.36 | $251,985.88 |
| | 11/15/2018 | 800 | $131.64 | $105,312.00 |
| | 12/14/2018 | 1,820 | $128.88 | $234,561.60 |
| | 12/14/2018 | 1,878 | $130.12 | $244,365.36 |
| | 12/14/2018 | 3,252 | $130.95 | $425,849.40 |
| | 12/14/2018 | 1,550 | $131.62 | $204,011.00 |
| | 1/15/2019 | 6,649 | $136.24 | $905,859.76 |
| | 1/15/2019 | 995 | $137.95 | $137,260.25 |
| | 1/15/2019 | 574 | $139.11 | $79,849.14 |
| | 1/15/2019 | 282 | $141.66 | $39,948.12 |
| | | 120,106 | Total (Sales) | $19,763,206.02 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| LUKATCH<br>Current Director and<br>Chairman of the Board | 12/1/2017 | 2,000 | $126.18 | $252,358.60 |
| | 12/1/2017 | 500 | $127.28 | $63,640.00 |
| | 3/1/2018 | 934 | $118.31 | $110,504.72 |
| | 3/1/2018 | 1,266 | $119.30 | $151,031.39 |
| | 3/1/2018 | 300 | $121.16 | $36,348.51 |
| | 6/6/2018 | 500 | $190.58 | $95,290.00 |
| | 7/6/2018 | 500 | $193.66 | $96,830.00 |
| | 8/6/2018 | 400 | $210.51 | $84,204.44 |
| | 8/6/2018 | 100 | $212.30 | $21,230.00 |
| | 9/6/2018 | 305 | $260.80 | $79,544.00 |
| | 9/6/2018 | 195 | $262.70 | $51,225.99 |
| | 10/5/2018 | 40 | $214.34 | $8,573.50 |
| | 10/5/2018 | 40 | $215.28 | $8,611.00 |
| | 10/5/2018 | 20 | $216.49 | $4,329.80 |
| | 10/5/2018 | 260 | $218.85 | $56,902.09 |
| | 10/5/2018 | 130 | $219.17 | $28,492.50 |
| | 10/5/2018 | 10 | $220.56 | $2,205.60 |
| | 11/6/2018 | 300 | $192.66 | $57,798.00 |
| | 11/6/2018 | 100 | $195.07 | $19,507.00 |
| | 11/6/2018 | 100 | $196.82 | $19,682.00 |
| | | 8,000 | Total (Sales) | $1,248,309.15 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| MCFARLAND<br>Current Director | 3/1/2018 | 400 | $117.66 | $47,065.00 |
| | 3/1/2018 | 1,400 | $119.17 | $166,832.96 |
| | 3/1/2018 | 200 | $121.09 | $24,217.00 |
| | 5/11/2018 | 600 | $180.57 | $108,343.98 |
| | 5/11/2018 | 1,525 | $181.78 | $277,207.79 |
| | 8/9/2018 | 721 | $226.92 | $163,606.58 |
| | 8/9/2018 | 830 | $227.94 | $189,193.19 |
| | 8/9/2018 | 100 | $230.47 | $23,047.00 |
| | 8/9/2018 | 300 | $231.59 | $69,476.31 |
| | 8/9/2018 | 49 | $233.05 | $11,419.45 |
| | 11/8/2018 | 2,000 | $155.24 | $310,480.00 |
| | | 8,125 | Total (Sales) | $1,390,889.26 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| MYERS | 11/17/2017 | 28,820 | $116.49 | $3,357,299.44 |

| Executive Vice President, Sales and Marketing | 11/17/2017 | 4,330 | $117.86 | $510,313.88 |
|---|---|---|---|---|
| | 11/17/2017 | 1,850 | $118.54 | $219,299.93 |
| | 12/11/2017 | 3,800 | $116.22 | $441,632.96 |
| | 12/11/2017 | 5,400 | $117.07 | $632,153.16 |
| | 12/11/2017 | 800 | $117.95 | $94,356.00 |
| | 6/7/2018 | 1,171 | $190.42 | $222,981.82 |
| | 6/7/2018 | 816 | $182.49 | $148,910.29 |
| | 6/7/2018 | 2,492 | $183.99 | $458,500.59 |
| | 6/7/2018 | 100 | $184.49 | $18,449.25 |
| | 6/7/2018 | 2,141 | $186.28 | $398,834.69 |
| | 6/7/2018 | 1,250 | $187.81 | $234,764.63 |
| | 6/7/2018 | 2,000 | $189.07 | $378,133.00 |
| | 6/7/2018 | 1,200 | $190.43 | $228,519.00 |
| | 6/18/2018 | 1,846 | $190.04 | $350,820.49 |
| | 6/20/2018 | 6,756 | $190.38 | $1,286,222.14 |
| | 6/20/2018 | 1,300 | $191.58 | $249,056.99 |
| | 7/9/2018 | 11,074 | $200.22 | $2,217,222.99 |
| | 8/9/2018 | 6,668 | $225.66 | $1,504,716.88 |
| | 8/9/2018 | 8,699 | $226.72 | $1,972,279.91 |
| | 8/9/2018 | 5,067 | $227.61 | $1,153,304.94 |
| | 8/9/2018 | 2,050 | $228.57 | $468,569.53 |
| | 8/9/2018 | 1,769 | $229.82 | $406,549.63 |
| | 8/9/2018 | 300 | $231.18 | $69,354.99 |
| | 8/9/2018 | 400 | $231.72 | $92,687.00 |
| | | 102,099 | Total (Sales) | $17,114,934.11 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| RIDER Current Director | 2/26/2018 | 3,303 | $130.71 | $431,723.57 |
| | 2/26/2018 | 1,277 | $131.49 | $167,916.69 |
| | 2/26/2018 | 642 | $132.61 | $85,133.63 |
| | 6/6/2018 | 1,850 | $190.52 | $352,453.12 |
| | 6/6/2018 | 400 | $191.66 | $76,664.52 |
| | 9/6/2018 | 440 | $256.18 | $112,721.31 |
| | 9/6/2018 | 510 | $257.96 | $131,557.92 |
| | 9/6/2018 | 300 | $258.75 | $77,624.01 |
| | 9/6/2018 | 600 | $260.56 | $156,337.02 |
| | 9/6/2018 | 200 | $261.08 | $52,216.00 |
| | 9/6/2018 | 200 | $262.79 | $52,558.00 |
| | | 9,722 | Total (Sales) | $1,696,905.79 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| SCRIBNER Executive Vice President, Operations | 11/13/2017 | 2,200 | $112.17 | $246,782.80 |
| | 11/13/2017 | 300 | $113.63 | $34,089.00 |
| | 12/14/2017 | 2,179 | $120.23 | $261,970.28 |
| | 12/14/2017 | 321 | $121.15 | $38,889.63 |
| | 1/16/2018 | 2,500 | $116.17 | $290,418.00 |
| | 2/15/2018 | 2,400 | $119.24 | $286,172.88 |
| | 2/15/2018 | 100 | $120.00 | $12,000.00 |
| | 3/15/2018 | 73 | $125.94 | $9,193.62 |
| | 3/15/2018 | 1,527 | $127.58 | $194,816.65 |
| | 3/15/2018 | 845 | $128.69 | $108,740.60 |
| | 3/15/2018 | 55 | $129.45 | $7,119.65 |
| | 4/16/2018 | 2,000 | $139.57 | $279,146.00 |
| | 4/16/2018 | 500 | $140.64 | $70,319.00 |
| | 9/17/2018 | 386 | $275.78 | $106,450.12 |
| | 9/17/2018 | 200 | $276.62 | $55,323.00 |
| | 9/17/2018 | 100 | $277.49 | $27,749.00 |

| | 9/17/2018 | 100 | $280.04 | $28,004.00 |
| | 9/17/2018 | 600 | $283.17 | $169,902.00 |
| | 9/17/2018 | 500 | $284.89 | $142,443.00 |
| | 9/17/2018 | 114 | $285.81 | $32,582.60 |
| | | 17,000 | Total (Sales) | $2,402,111.82 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
| --- | --- | --- | --- | --- |
| **TAYLOR**<br>**Current Executive Vice President, Engineering** | 2/13/2018 | 4,208 | $115.74 | $487,033.92 |
| | 2/13/2018 | 5,692 | $116.46 | $662,907.40 |
| | 2/13/2018 | 100 | $117.12 | $11,711.50 |
| | 2/14/2018 | 5,000 | $120.09 | $600,435.50 |
| | 2/16/2018 | 5,000 | $125.06 | $625,299.50 |
| | 2/21/2018 | 3,214 | $130.32 | $418,850.73 |
| | 2/21/2018 | 1,786 | $131.56 | $234,958.48 |
| | 6/1/2018 | 2,574 | $182.30 | $469,242.26 |
| | 6/1/2018 | 1,000 | $183.12 | $183,119.70 |
| | 6/1/2018 | 1,116 | $184.42 | $205,810.38 |
| | 6/1/2018 | 310 | $184.92 | $57,325.29 |
| | 7/2/2018 | 100 | $179.53 | $17,953.00 |
| | 7/2/2018 | 1,600 | $183.55 | $293,681.44 |
| | 7/2/2018 | 2,900 | $184.83 | $536,020.05 |
| | 7/2/2018 | 400 | $185.89 | $74,354.00 |
| | 8/1/2018 | 600 | $196.19 | $117,716.40 |
| | 8/1/2018 | 2,000 | $196.92 | $393,846.00 |
| | 8/1/2018 | 1,000 | $198.26 | $198,257.00 |
| | 8/1/2018 | 1,200 | $199.25 | $239,099.04 |
| | 8/1/2018 | 200 | $200.47 | $40,094.60 |
| | 9/4/2018 | 2,700 | $258.24 | $697,240.44 |
| | 9/4/2018 | 800 | $259.09 | $207,274.00 |
| | 9/4/2018 | 600 | $260.47 | $156,280.98 |
| | 9/4/2018 | 500 | $261.90 | $130,952.35 |
| | 9/4/2018 | 100 | $262.45 | $26,245.00 |
| | 9/4/2018 | 300 | $263.68 | $79,104.00 |
| | 10/1/2018 | 1,311 | $243.15 | $318,765.45 |
| | 10/1/2018 | 1,080 | $243.76 | $263,264.80 |
| | 10/1/2018 | 1,268 | $245.62 | $311,445.53 |
| | 10/1/2018 | 1,341 | $246.36 | $330,366.08 |
| | | 50,000 | Total (Sales) | $8,388,654.81 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
| --- | --- | --- | --- | --- |
| **WILKINSON**<br>**Current Chief Executive Officer, President, and Director** | 1/16/2018 | 5,656 | $114.37 | $646,860.32 |
| | 1/16/2018 | 8,043 | $115.54 | $929,264.90 |
| | 1/16/2018 | 16,952 | $116.31 | $1,971,648.13 |
| | 5/1/2018 | 800 | $167.38 | $133,905.04 |
| | 5/1/2018 | 2,800 | $169.07 | $473,397.96 |
| | 5/1/2018 | 1,600 | $170.34 | $272,544.48 |
| | 5/1/2018 | 2,400 | $171.16 | $410,775.84 |
| | 5/1/2018 | 900 | $172.25 | $155,022.03 |
| | 5/1/2018 | 300 | $173.32 | $51,995.07 |
| | 5/1/2018 | 398 | $174.00 | $69,252.00 |
| | 8/1/2018 | 2,300 | $196.55 | $452,072.82 |
| | 8/1/2018 | 901 | $197.35 | $177,812.17 |
| | 8/1/2018 | 3,008 | $198.62 | $597,448.06 |
| | 8/1/2018 | 1,795 | $199.55 | $358,196.92 |
| | 8/1/2018 | 907 | $200.88 | $182,197.71 |
| | 8/1/2018 | 7,044 | $201.94 | $1,422,460.43 |

| | 8/1/2018 | 1,232 | $202.92 | $249,996.95 |
|---|---|---|---|---|
| | 8/1/2018 | 1 | $203.58 | $203.58 |
| | | 57,037 | Total (Sales) | $8,555,054.39 |
| | | | | |
| TOTAL: | | 460,349 | Total (Sales) | $71,828,794.29 |

## DAMAGES TO INOGEN

177.   As a result of the Individual Defendants' improprieties, Inogen disseminated improper, public statements concerning the Company's business operations and financial prospects.  These improper statements have devastated Inogen's credibility as reflected by the Company's nearly $5 billion, or 82.6%, market capitalization loss.

178.   Inogen's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Inogen's current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.  Inogen's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

179.   Further, as a direct and proximate result of the Individual Defendants' actions, Inogen has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred from defending and paying any settlement in the Securities Class Action;

(b)   costs incurred in hiring employees and third parties that used deceptive tactics to increase sales;

(c)   costs incurred to investigate wrongdoing; and

(d)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Inogen.

180.   In addition, since the Insider Selling Defendants utilized the Company's nonpublic information to sell their stock, they must disgorge any profits from these sales back to Inogen.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

181.   Plaintiff brings this action derivatively in the right and for the benefit of Inogen to redress injuries suffered, and to be suffered, by Inogen as a direct result of violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Inogen is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

182.   Plaintiff will adequately and fairly represent the interests of Inogen in enforcing and prosecuting its rights.

183.   Plaintiff was a stockholder of Inogen at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Inogen stockholder.

184.   The current Board of Inogen consists of the following eight individuals: defendants Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland, Rider, and Wilkinson.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

185.  As alleged above, defendants Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland, Rider, and Wilkinson breached their fiduciary duties of loyalty by authorizing improper sales tactics and making improper statements in the Company's press releases, SEC filings, and oral communications regarding Inogen's business practices, financials, financial prospects, and disclosure controls.  These defendants had knowledge about the improper sales tactics and statements concerning sales

growth because POC sales are Inogen's core operating segment, generating approximately 88% of the Company's revenue.  Accordingly, the Director Defendants (the entire Board) face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

186.  Defendants Huggenberger, Wilkinson, Rider, McFarland, Lukatch, and Anderson-Ray each sold Inogen stock under highly suspicious circumstances.  As members of the Board, these defendants possessed material, nonpublic Company information and used that information to benefit themselves.  These defendants sold stock based on this knowledge of material, nonpublic Company information regarding the Company's business operations, financial prospects, and disclosure controls and the impending decrease in the value of their holdings of Inogen.  Accordingly, defendants Huggenberger, Wilkinson, Rider, McFarland, Lukatch, and Anderson-Ray face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon these defendants is futile.

187.  Defendants Anderson-Ray, Greer, and McFarland, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that the Audit Committee is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Anderson-Ray, Greer, and McFarland face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

188.  The principal professional occupation of defendant Wilkinson is his employment with Inogen, pursuant to which he has received and continues to receive

substantial monetary compensation and other benefits as alleged above (almost $2.7 million in total compensation in 2018).   Accordingly, defendant Wilkinson lacks independence from the current Board due to his interest in maintaining his executive position at Inogen.  This lack of independence renders defendant Wilkinson incapable of impartially considering a demand to commence and vigorously prosecute this action. Demand is futile as to defendant Wilkinson.

189.  Defendant Beardsley is a Managing Partner at Novo Ventures (US), a subsidiary of Novo Holdings A/S, a life science investment company.  Novo Holdings A/S owns 16.19% of Inogen stock, more than any other company or individual.  Defendant Beardsley has made or stands to make a substantial amount of money from Novo Holdings A/S's investment in Inogen, given the investment company's large stake in Inogen.  Thus, defendant Beardsley will not vote to initiate litigation against defendant Wilkinson, Inogen's CEO, due to defendant Beardsley's company, Novo Ventures (US), making hundreds of millions of dollars from its investment in Inogen.

190.  Plaintiff has not made any demand on the other stockholders of Inogen  to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Inogen is a publicly held company with over 21.9 million shares outstanding and thousands of stockholders as of July 31, 2019;

(b)   making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)   making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

191.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

192.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

193.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy.  In the 2018 Proxy, the Board solicited stockholder votes to reelect defendants Greer, Rider, and Beardsley to the Board.

194.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2019 Proxy.  In the 2019 Proxy, the Board solicited stockholder votes to reelect defendants Anderson-Ray, McFarland, and Wilkinson to the Board.

195.   The Proxies, however, misrepresented and failed to disclose that: (i) the Company exaggerated the scope of its TAM for its POCs; (ii) the Company inaccurately reported the basis for its TAM determinations; (iii) the Company misattributed its sales success to the skill of its salesforce, rather than its dishonest sales practices; (iv) the Company reported unsustainable growth in business-to-business domestic sales to HME suppliers, and failed to disclose that such growth harmed its direct-to-consumer sales growth; (v) the Company overstated the proportion of its sales that were attributable to Medicare's steadier market; and (vi) the Company failed to maintain internal controls.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of the defendants' wrongful conduct, Inogen misled and deceived its stockholders by making misleading statements that were essential links in stockholders heeding the Company's recommendation to reelect defendants Anderson-Ray, Beardsley, Greer, McFarland, Rider, and Wilkinson to the

Board.

196.   Plaintiff, on behalf of Inogen, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

197.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198.   The Individual Defendants owed and owe Inogen fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Inogen the highest obligation of good faith, fair dealing, loyalty, and due care.

199.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Inogen, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

200.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company overstated the true size of the TAM for its POCs, claiming the TAM was upwards of three million people; (ii) the Company misstated the basis for its calculation of the TAM; (iii) the Company falsely attributed its sales growth to the sales acumen of its salesforce, when in truth the growth was due in large part to deceptive sales tactics designed to deceive Inogen's elderly customer base; (iv) as such, Inogen's reported growth in direct-to-consumer sales and domestic business-to-business sales to HME providers was inflated and unsustainable; (v) very little of Inogen's business came from the more stable Medicare market; and (vi) as a result, Inogen's public statements concerning its business operations and financial prospects were improper when made.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

201.   The Director Defendants, as directors of the Company, owed Inogen the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning Inogen's business and financial prospects.  The Director Defendants knew or were reckless in not knowing that: (i) the Company overstated the true size of the TAM for its POCs, claiming the TAM was upwards of three million people; (ii) the Company misstated the basis for its calculation of the TAM; (iii) that the Company falsely attributed its sales growth to the sales acumen of its salesforce, when in truth the growth was due in large part to deceptive sales tactics designed to deceive Inogen's elderly customer base; (iv) as such, Inogen's reported growth in direct-to-consumer sales and domestic business-to-business sales to HME providers was inflated and unsustainable; (v) very little of Inogen's business came from the more stable Medicare market; and (vi) as a result, Inogen's public statements concerning its business operations and financial prospects were improper when made.  Accordingly, these defendants breached their duty of loyalty to the Company.

202.   The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

203.   The Insider Selling Defendants breached their duty of loyalty by selling Inogen stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was material, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Inogen common stock.

204.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inogen has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

205.   Plaintiff, on behalf of Inogen, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

206.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207.   As a result of the Individual Defendants' failure to properly supervise and monitor the adequacy of Inogen's disclosure controls and procedures, the Individual Defendants have caused Inogen to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

208.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

209.   Plaintiff, on behalf of Inogen, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

210.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

211.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Inogen.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Inogen.

212.   The Insider Selling Defendants sold Inogen stock while in possession of material, nonpublic information that artificially inflated the price of Inogen stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

213.   Plaintiff, as a stockholder and representative of Inogen, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

214.   Plaintiff, on behalf of Inogen, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Inogen, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.   Directing Inogen to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inogen and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.   a proposal to strengthen the Company's controls over financial reporting;

2.   a proposal to control insider selling;

3.   a proposal to strengthen the Board's oversight of its sales and marketing practices, including its oversight of its sales employees and reseller network;

4.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.   a provision to permit the stockholders of Inogen to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Inogen has an effective remedy;

D.      Awarding to Inogen restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 9, 2019

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO

_/s/Brian J. Robbins_
BRIAN J. ROBBINS

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        soddo@robbinsarroyo.com

Attorneys for Plaintiff

1384228

<u>VERIFICATION</u>

I, Carole Butcher, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____10/4/19_____

_____
CAROLE BUTCHER